Argued at Pendleton November 1, 1922, affirmed January 9, 1923.

# CARMICHAEL *v.* CARMICHAEL.

(211 Pac. 916.)

**Appeal and Error—All Facts Well Pleaded Accepted as True in Considering Demurrer.**

1. On considering a demurrer on appeal, all facts well pleaded must be accepted as true.

**Divorce—Recrimination Based upon Maxim That He Who Comes into Equity must Come With Clean Hands.**

2. The doctrine of recrimination in divorce is an application of the equity maxim that he who comes into equity must come with clean hands.

**Divorce—A Wife may Set Up Cruelty in Recrimination to Husband's Suit for Divorce on the Ground of Impotency.**

3. The doctrine that divorce is a remedy for the innocent and injured party only, and that it will not be allowed where it appears that complainant, although otherwise entitled to a decree, has been guilty of acts that constitute a cause for divorce, is applicable in suits based upon impotency of the wife as a ground, and under such circumstances defendant may set up in recrimination cruelty on the part of plaintiff.

**Divorce—"Impotency" as Ground for Divorce Means Inability to Copulate.**

4. Under Section 507, subdivision 1, Or. L., providing that a marriage may be dissolved for impotency existing at the time of the marriage and continuing to the commencement of the suit, the term "impotency" means inability to copulate, and does not include ability to reproduce.

**Divorce—Decree Held Subject to Vacation for Collusion.**

5. Where it appeared that after a husband had brought suit against his wife for her fault, she agreeing thereto, and he accompanied her to the office of plaintiff's attorney, to that of a doctor, in order to procure evidence, and to the county seat, and made arrangements whereby the wife's attorney was to file a demurrer which was to be withdrawn and no contest made, and that after the papers were filed the husband took his wife to lunch and then to the depot, where she boarded a train to leave the jurisdiction, while the husband went to the courthouse to procure his decree, the decree so procured was subject to being set aside for collusion.

---

What constitutes collusion as bar to divorce, see notes in 120 Am. St. Rep. 520; 10 Ann. Cas. 819; Ann. Cas. 1915C, 80; 2 A. L. R. 699.

*Res judicata* doctrine as applicable to divorce proceedings, see notes in Ann. Cas. 1916B, 875, 924, 932, 934, 941, 944; Ann. Cas. 1918E, 1230; 26 L. R. A. (N. S.) 577.

**Divorce—Successful Defense After Setting Aside Default Decree may be Considered on Appeal to Determine Whether Decree was Erroneously Vacated.**

6. Where a decree of divorce in favor of the husband has been set aside, pursuant to the wife's motion, that a divorce was thereafter denied and plaintiff's complaint dismissed, is a matter that will be considered on appeal in determining whether error was committed by the trial court in setting aside the decree.

**Divorce—Rights of Second Wife Subordinate Where Default Divorce Decree Set Aside.**

7. Where a husband procures a divorce from wife and subsequently enters into a second marriage, the parties to such second marriage are presumed to know the law as stated in section 103, Or. L., authorizing the court, in its discretion, within one year after notice thereof, to relieve a party against a judgment taken against him through his mistake, inadvertence, surprise or excusable neglect, and the rights of the second wife will not prevent a vacation of a default divorce decree, particularly when such second marriage was entered into after application to set aside the decree had been filed against the husband.

From Umatilla: H. H. BELT. Judge.

In Banc.

The plaintiff seeks a divorce from his wife. She resists him. He grounds his cause of suit upon the charge of impotency. The parties hereto were married on April 30, 1912. On September 10, 1920, the plaintiff, through his then attorney, Homer I. Watts, filed his complaint in the Circuit Court of the State of Oregon for Umatilla County, praying for a dissolution of his marriage relation with Mabel E. Carmichael. The complaint alleges that "the defendant, at the time of marriage to the plaintiff, * * was impotent, barren and sterile, and has continued to remain so * * ."

Two or three days previous to the commencement of this suit, it was agreed between the parties hereto that the plaintiff might file a petition for a divorce. A property settlement was had. Together they visited plaintiff's attorney and discussed the matter of the dissolution of the marriage status existing be-

tween them. For the purpose of securing testimony, they called upon the family physician in order to remove the seal of confidential relation. They remained together at the family residence until the 10th of September, 1920, when, in pursuance of their understanding with Watts, plaintiff's attorney, they went to Pendleton to file suit. On that date they went to the office of an attorney in Pendleton, who was retained by the defendant. On the same day, pursuant to their understanding, plaintiff filed his complaint in the Circuit Court. Service of process was made upon the defendant. She acknowledged due receipt thereof and instructed her attorney to appear in court and file a demurrer. It was the understanding between her husband and herself that the case should be heard upon the day of service. After retaining and instructing her attorney she, with her husband, went to lunch. He then took her to the depot, purchased a ticket to Seattle, put her upon the train, and immediately thereafter went to the courthouse. The case was called. The demurrer which had been filed by defendant's attorney was withdrawn, with the announcement that the defendant did not wish to appear further. The testimony was then taken. In truth, the case was filed as per program, appearance made, testimony adduced on the day the married couple came to Pendleton and before the speeding train had carried the wife from the confines of the state. She testified that plaintiff said, in effect, that a divorce would be granted within fifteen minutes. The case, however, was taken under advisement, and not until September 23d thereafter was a decree rendered annulling the marriage. A copy of the decree was sent to the defendant in Seattle. Upon its receipt she wrote to plaintiff,

wondering "what took Phelps [the circuit judge] so long. Are you satisfied now?"

As soon as the plaintiff procured a copy of the decree, he exhibited it to Elsie O'Hara, whom the trial judge found to be "the woman in the case" and the essential cause of the divorce.

As time went on, the defendant wrote a number of letters to plaintiff, begging for a reconciliation with him, and, in February, 1921, returned to the vicinity of the Carmichael home.

On the seventh day of March, 1921, defendant filed a motion for an order vacating the divorce decree. She also requested the court for leave to file an answer, which she tendered with her motion. Upon the hearing her motion was supported by her own affidavit, as well as by the affidavits of others containing corroborative matter which tended to support her claim that she had been coerced to consent to the divorce proceedings, and that she at all times was under duress of the plaintiff in the matter of the divorce hearing. The record discloses a number of counter-affidavits filed by the plaintiff.

On May 16, 1921, the defendant's motion for vacation of the decree was granted and defendant was allowed to file her answer, which denied the charge of impotency preferred against her and alleged facts constituting a cause of divorce against the plaintiff, not as a cross-bill, however, but which pleaded the matter in bar of the plaintiff's cause of suit. From the order vacating the decree and permitting the filing of the answer, the plaintiff appealed to this court. The appeal was dismissed for the reason that it was premature: See *Carmichael* v. *Carmichael,* 101 Or. 172 (199 Pac. 385). Thereafter the case was heard upon its merits. The court found, among other

things, as a fact, that the plaintiff had maintained toward the defendant

"a course of cruel and inhuman treatment; * * that defendant is a frail woman; and plaintiff is a large, robust man; that he * * has cursed her and called her vile names; that the marital demands of the plaintiff have been excessive; * * that as a part of said cruelty, the plaintiff sought to secure a divorce from defendant and to cast off the defendant that he might marry another woman, and sought to, and did, prevent the defendant from making an effectual defense in the said suit for divorce; that pursuant to plaintiff's design in this regard, he sent defendant out of the State of Oregon."

The court denied the plaintiff a divorce and dismissed his complaint. This appeal is prosecuted from that order.

The rulings of the court assigned as erroneous involve (1) the meaning of the term "impotent," as used in the divorce statute and the sufficiency of the proof thereof; (2) the right of the defendant to plead recrimination in bar to impotency; (3) the order of the court vacating the divorce decree.

                                        AFFIRMED.

For appellant there was a brief over the name of *Messrs. Fee & Fee,* with an oral argument by *Mr. James A. Fee, Jr.*

For respondent there was a brief over the names of *Messrs. Raley & Steiwer* and *H. J. Warner,* with an oral argument by *Mr. Frederick W. Steiwer.*

BROWN, J.—Did the court err in overruling plaintiff's motion as to the matter alleged in bar of his suit?

Plaintiff charged impotency on the part of the defendant. The defendant, after denying this charge, pleaded in bar facts constituting cruel and inhuman treatment that, if proved, would afford her grounds for a divorce.

1. For the purpose of considering this demurrer, we must accept as true all facts well pleaded.

2. By filing her plea in bar, the defendant has invoked the protection of the well-established principle of recrimination. The doctrine of recrimination is an application of the wholesome maxim in equity that he who comes into equity must come with clean hands: Am. & Eng. Ency. of Law (2 ed.), 817.

"It is a general principle, applicable to all divorce proceedings, that the spouse petitioning for relief must have been both clear of blame and consistent in availing himself or herself of the other's matrimonial delinquency. By 'clear of blame' we may mean (1) without substantial fault in causing the offense complained of, and, furthermore, (2) free from other misconduct equally reprehensible under the divorce laws. For if both parties have the same right to divorce, the rule is that neither has, since only an innocent spouse may properly ask the court to interpose." 2 Schouler, Marriage, Divorce, Separation (6 ed.), § 1701.

It was said in *Tillison* v. *Tillison*, 63 Vt. 411 (22 Atl. 531):

"He who has violated his marriage vow should be deprived of his remedy of divorce."

3. That divorce is a remedy for the innocent and injured party only, and that it will not be allowed where it appears that the complainant, although otherwise entitled to a decree, has been guilty of acts that constitute a cause for divorce, is a principle taught by the decisions in this jurisdiction, as

well as by court decisions elsewhere; and, in this circumstance, such misconduct on the part of the plaintiff may be set up by defendant in recrimination.

In the case of *Earle* v. *Earle,* 43 Or. 293 (72 Pac. 976), this court held that misconduct upon the part of the plaintiff was a defense to her suit for the dissolution of the marriage relation with her husband. In that case the defense was not even pleaded, but was brought out on cross-examination by the district attorney. The court adopted the following doctrine from an eminent text-writer in his work on Marriage and Divorce:

" 'It is,' says Mr. Bishop, 'a bar to any suit to dissolve a valid marriage, or to separate the parties from bed and board, that either before or after the complaint of *delictum* transpired the plaintiff himself did what, whether of the like offending or any other, was cause for a divorce of either sort.' 2 Bishop, Marriage, Div. and Sep., § 365."

In the case of *Wheeler* v. *Wheeler,* 18 Or. 261 (24 Pac. 900), it was held that where the party asking for a divorce is liable to a charge which is a cause for divorce, it will prevent him from obtaining such divorce, notwithstanding the wife may have misconducted herself.

In the case of *Hawley* v. *Hawley,* 101 Or. 649 (199 Pac. 589), we said:

"In their acts of crimination and recrimination, the parties hereto have overlooked the principle that a divorce is a remedy for the innocent against the guilty, and not a relief for wrong against wrong. In *Crim* v. *Crim,* 66 Or. 258 (134 Pac. 13), Mr. Justice MOORE said: 'The plaintiff in a suit for divorce is not entitled to relief unless the evidence shows that she has been free from fault.' Again, this court holds * * 'equity relieves the injured party, but not the vanquished.' *Beckley* v. *Beckley,* 23 Or.

226, 231 (31 Pac. 470). In *Hengen* v. *Hengen,* 85 Or.
155, 162, 163 (166 Pac. 525), this court, speaking
through Mr. Justice BURNETT, said: 'On the prin-
ciple that one who comes into a court of equity for
relief must come with clean hands, the following prece-
dents may be read with profit in this connection:
*Taylor* v. *Taylor,* 11 Or. 303 (8 Pac. 354); *Adams*
v. *Adams,* 12 Or. 176 (6 Pac. 677); *Wheeler* v.
*Wheeler,* 18 Or. 261 (24 Pac. 900); *Mendelson* v.
*Mendelson,* 37 Or. 163 (61 Pac. 645); *Crim* v. *Crim,*
66 Or. 258 (134 Pac. 13); *Matlock* v. *Matlock,* 72 Or.
330 (143 Pac. 1010). * * It is enough to say that he
is proved to be much in fault and that he does not
come into chancery with that clear record which
alone entitles him to relief.' Also see *Mosier* v.
*Mosier,* 89 Or. 477 (174 Pac. 732)."

To like effect is *Jenkins* v. *Jenkins,* 103 Or. 208
(204 Pac. 165).

That cruel and inhuman treatment may be pleaded
in bar of a divorce upon a charge of impotency, see
*Decker* v. *Decker,* 193 Ill. 285 (61 N. E. 1108, 186 Am.
St. Rep. 325), and note by Freeman.

We must hold that it was not error for the court
to overrule the plaintiff's demurrer to the plea in
bar, and that the evidence supporting the facts al-
leged as cruel and inhuman treatment was properly
admitted and considered in support of such plea.

4. Plaintiff charged that the defendant was "im-
potent, barren, and sterile." The original case was
tried upon the theory that impotency is synonymous
with sterility or barrenness. The testimony showed
that following the marriage of the parties the wife
possessed the ability to copulate, and the most that
could be claimed under that evidence was that she
was not able to procreate. There are court deci-
sions, works on medical jurisprudence, and defini-
tions by lexicographers showing that the term "im-

potency'' has many shades of meaning, and there is some authority supporting the court in its original decision. But by the great weight of authority, the term ''impotency,'' as used in subdivision 1, Section 507, Or. L., means inability to copulate, and does not include ability to reproduce.

A text-writer has said:

''Impotence, as a cause of divorce, means incapacity for sexual intercourse, and does not also imply incapacity to beget or bear children.'' 2 Schouler, Marriage, Divorce and Separation, § 1549.

The following is a comprehensive definition of the term:

''Impotency is an incurable incapacity that admits neither copulation nor procreation, the copulation contemplated being *copula vera,* and not partial, imperfect, or unnatural. It must be incurable and render complete sexual intercourse practically impossible. Thus, absence of conceptive power, or barrenness, does not constitute impotency, if there is complete power of copulation.'' 19 C. J., § 71B.

''Impotency is such incurable sexual incapacity of one of the parties at the time of marriage as prevents true and natural copulation. It is such deformity or weakness as prevents a consummation of the marriage by sexual intercourse. It is not sterility, or barrenness. * * The incapacity must be permanent or incurable.'' 19 Am. & Eng. Ency. of Law, 1165, 1166.

''Ability to procreate is not the test; it is enough if the parties are able to have sexual intercourse (citing authorities); and impotency arising after the marriage does not avoid it.'' 2 Bouvier's Law Dictionary, p. 1514.

Dr. Bishop defines the impediment of impotency to marriage as follows:

''The doctrine of this chapter is that since marriage is a sexual relation, having in view the propagation

of the species, a man or woman so imperfect in the sexual organism as to be perpetually and incurably incapable of the connection which precedes parentage cannot enter into indissoluble matrimony with another having no notice of the incapacity. Yet, as marriage continues or is properly contracted after the years of fruitfulness have gone by, and as in every aspect mere sterility could not wisely be made a matrimonial impediment, the law's test is simply the ability or inability for copula, not fruitfulness.'' 1 Bishop on Marriage and Divorce, § 758.

"Though * * the law's inquiry after impotence is limited to the capacity for copula, and does not extend to that for resulting fruitfulness, yet * * pregnancy may, in very special circumstances, come from a connection too imperfect to be deemed copula, and if, in fact, it does, the marriage cannot afterwards be treated as null.'' 1 Bishop on Marriage and Divorce, § 765.

In setting forth the causes for divorce, our statute reads:

"(1) Impotency existing at the time of the marriage, and continuing to the commencement of the suit.''

The testimony of both the plaintiff and the defendant shows that the wife was not impotent at the time of marriage.

Under the evidence adduced upon the trial of the cause, clearly the plaintiff was not entitled to a divorce.

The next question presented is: Did the court err in setting aside the decree of divorce entered on September 23, 1920?

The marriage contract, unlike other contracts, may not be annulled at the pleasure of the plaintiff and the defendant. It is often said by the courts that a divorce proceeding is triangular in its nature. The

state, as the guardian of the public welfare, is an interested party in a suit to alter the marriage status. The commonwealth is interested not only in preserving the contract of the first marriage, but likewise is interested in marriages that are contracted with innocent third persons upon the faith of the decree of the court: 2 Bishop, Marriage and Divorce, § 1535; 1 Black, Judgments, § 320; 9 R. C. L., §§ 12, 13.

In the case at bar, the facts seem to the writer to establish a case of collusion between George B. and Mabel E. Carmichael to defraud the court. We have set out in the statement the action of both parties in preparation for securing the decree of divorce. The testimony tends to establish that Carmichael thought he had made a bad bargain in the marriage. She likewise seemed to think that she had make a mistake when she married George B. Carmichael. There is testimony on the part of the defendant to the effect that she is a delicate, refined, educated, nervous woman, who had intermarried with a coarse, rugged man weighing over two hundred pounds, with health, strength and the temper of a roaring Bengal tiger. There is also testimony tending to show that each had become tired of the other. Plaintiff's ungoverned sexual demands upon his delicate wife, according to her version, had destroyed her health and shattered her nerves. She had become highly nervous, sometimes hysterical, and on such occasions expressed her disgust for him. He was not only brutal in matters sexual, but, according to the testimony of some of her witnesses, the language that he applied to defendant, whether alone or in company, was often immoral, indecent, profane, obscene, filthy and utterly too nasty to print. Whenever the wife

failed to gratify the inordinate sexual desires of the husband, he expressed his displeasure in violent terms. Due to plaintiff's averred brutal treatment of his wife, she had become broken-backed and broken-hearted. She had reason to regard her marriage with Carmichael as a failure. A property settlement was made, which was entirely lawful within itself.

5. The testimony shows a trip together to the office of plaintiff's attorney, to that of the doctor, and to the county seat; the securing of an attorney for the defendant and the arrangements for a lightning-fast divorce suit; a trip to lunch; then to the depot, where defendant boarded a train and went her way while the plaintiff betook himself to the courthouse for the purpose of obtaining his much desired decree of divorce. The letter from Washington written by defendant to plaintiff upon her receipt of copy of the decree shows that she had knowledge of the divorce proceedings and that the suit was to be a hurried affair, if possible. She complained of the delay of the judge. The letter also tended to show that the divorce was had at plaintiff's request, but with the consent of defendant. Had these facts been known to the trial judge, no doubt he would have denied the divorce, upon the ground of collusion. Had the state filed an answer in the case and become a party to the pleadings, there is no doubt that the decree could have been set aside upon its application.

If collusion existed between the parties, the defendant does not come into court with clean hands. But the trial court took the view,—and there is some evidence in the record sustaining it,—that she was coerced by her husband; that she was under duress; that she went to the offices of the attorneys in the cause, and to the office of the doctor, because of the

106 Or.—14

duress under which she was acting; that she permitted the divorce case to go by default and left the state because she believed that if she did not she would sustain great bodily injury, or death, at the hands of her husband.. The record shows that he had intended to "get rid" of his wife; that he wished to marry another. The record likewise is filled with incidents showing his cruel and inhuman treatment of the dumb and the weak. He tortured cats and dogs. He willfully inflicted injury upon sheep, cows, horses, a friendless boy, and upon his wife. The wife, knowing all these things, and having suffered bodily injury from her husband, and having been threatened by him if she did not consent to a divorce, may have been impelled by fear to do what she did and to omit that which she should have done in order to protect her interests.

6. The propriety of setting aside the decree has now been passed upon by both Honorable GILBERT W. PHELPS, Circuit Judge, who granted the decree of divorce, and Honorable H. H. BELT, Circuit Judge, who presided at the trial wherein the decree of divorce was denied and plaintiff's complaint dismissed. That a successful defense was afterwards made to the cause of suit is a matter that we should consider in determining whether error was committed by the trial court in setting aside the default divorce decree: *Coos Bay Nav. Co.* v. *Endicott,* 34 Or. 573, 576 (57 Pac. 61).

7. It is urged with much force and ability that by vacation of the divorce decree the rights of the second wife have been ignored.

The writer agrees with all that counsel has said in relation to the necessity for the stability of divorce and other decrees, and that the rights of innocent

third parties to a second marriage should be considered. The parties to the second marriage are presumed to know the law, as expressed in Section 103, Or. L. Furthermore, the record before us shows that plaintiff entered into his second marriage after the application to set aside the default decree had been filed and served upon him. We regret to add that from the record it cannot be said that the second wife is an innocent third party.

When this case,—*Carmichael* v. *Carmichael*, 101 Or. 172 (199 Pac. 385),—was here upon appeal from the order vacating the default decree, we announced the principles that guide judges to a conclusion in cases of this character. There is no good reason for a restatement of the rules there set down.

After a most painstaking investigation of the facts, we cannot say that a plain and manifest abuse of discretion vested in the trial court by the terms of Section 103, Or. L., has been committed.

This case is affirmed.                          AFFIRMED.

Mr. Justice BURNETT did not participate in the consideration of this case.