Argued June 28, reversed and suit dismissed July 17, 1917.

## HENGEN v. HENGEN.*

(166 Pac. 525.)

**Divorce—Fault of Complainant—Right to Relief.**

1. Where plaintiff suing for divorce himself showed, that he was a willing participant in the parties' numerous quarrels, and that he resorted to personal violence against defendant at least twice, he was equally in fault, and was not entitled to divorce, on the principle that one who comes into equity for relief must come with clean hands.

[As to mutuality of fault in divorce cases, see note in 86 Am. St. Rep. 334.]

**Divorce—Granting of Suit Money—Statute.**

2. The granting of suit money under Section 513, L. O. L., as amended by Laws of 1913, page 57, is an interlocutory matter, and is to be made only before decree and not afterward; and, where

*On making charges of adultery as grounds for divorce, see notes in 18 L. R. A. (N. S.) 300; 34 L. R. A. (N. S.) 360.

On question of jurisdiction to award temporary alimony, suit money and counsel fee pending an appeal in divorce suit, see notes in 27 L. R. A. (N. S.) 712; L. R. A. 1916F, 1259.     REPORTER.

the Circuit Court awarded defendant wife $500 for such purpose *pendente lite,* the award exhausted the original jurisdiction on the subject.

**Divorce—Appeal—Order Granting Suit Money.**

3.   The granting of suit money to a wife sued for divorce might be reviewed on appeal from the decree like any other question involved.

**Divorce—Cash Awards to Wife—Statutes.**

4.   Cash awards to a wife sued for divorce are controlled by legislation.

**Divorce—Alimony—Cash Award—Statute.**

5.   Under Section 513, L. O. L., as amended by Laws of 1913, page 57, providing that whenever a marriage shall be declared void or dissolved the court shall have power to decree, against the party in fault, such an amount of money in gross or in installments as may be proper for such party to contribute to the other's maintenance, the cash award to a wife sued for divorce to be made in final decree is dependent upon the dissolution of the marriage, or the declaration that it is void; no alimony can be granted unless the marriage is dissolved or annulled, and even then the recovery must be from the party in fault.

**Divorce—Grounds—Incompatibility of Temper.**

6.   Incompatibility of temper is not ground for divorce under the laws of Oregon.

From Washington: JAMES U. CAMPBELL, Judge.

Department 1.   Statement by MR. JUSTICE BURNETT.

This is a suit for the dissolution of the marriage contract between the plaintiff and the defendant. The husband plaintiff founds his suit upon two counts. One is adultery alleged to have been committed by the wife with one Francis M. Hale on sundry occasions in the City of Chicago; the other is cruel and inhuman treatment in accusing the plaintiff of improper relations with other women and manifesting towards him a general nagging disposition.

The defense consists of a denial of the charges of the complaint, together with counter-charges of adultery with four different women named in the answer and cruelty of the husband in that he was extremely jealous and suspicious of the defendant without cause

and on many occasions quarreled with her and abused her and several times assaulted and cruelly beat her. She also pleads in substance that he is estopped to deny that he wrongfully deserted her for that in an Illinois court she brought suit against him for maintenance withheld from her while she was living separate and apart from him without her fault and he made the same charges against her which he states in his complaint in the instant litigation, withdrew some of them, and urged the others, with the result that the court there found in her favor that she was not to blame and decreed that he pay her certain amounts for her support. As a fourth answer she alleges the allowance by the Circuit Court *pendente lite* of a certain amount to enable her to conduct her defense and asks for an additional amount to be given her in the final adjudication. Her prayer is for this financial relief and for a dismissal of the suit. She does not seek a dissolution of the marriage relation involved.

The reply traversed the answer. After a hearing, the Circuit Court rendered a decree in substance for the dissolution of the marriage contract as prayed for by the plaintiff on condition that he pay to the defendant $11,000 within ten days from her demand upon him therefor, in default of which she should have a right to apply to the court to set aside the decree. From this determination the defendant appeals.

REVERSED AND SUIT DISMISSED.

For appellant there was a brief over the names of *Messrs. Veazie, McCourt & Veazie, Messrs. Manierre & Pratt* (of Chicago, Illinois) and *Mr. Elton Watkins,* with an oral argument by *Mr. Watkins.*

For respondent there was a brief over the names of *Messrs. Giltner & Sewall, Mr. William G. Hare* and

*Mr. E. C. Lancaster* (of Chicago, Illinois), with an oral argument by *Mr. R. R. Giltner.*

MR. JUSTICE BURNETT delivered the opinion of the court.

The parties were married in Denver, Colorado, April 16, 1900, and after a married life of increasing rancor finally separated in Chicago, September 13, 1910. The plaintiff is a promoter. When he married her the defendant was a manicurist. As a side-light upon the *dramatis personae* we note that the plaintiff offered proof on cross-examination of the defendant and she admitted that prior to their marriage they made a trip from Denver to New York and back as man and wife about February, 1900. With this advertisement of each other's characters and propensities it is not to be wondered that each was suspicious of the other. In the view we take of this case it is not requisite that we should undertake to justify her conduct in any respect.

It is practically undisputed on the part of the plaintiff that he was exceedingly strict with the defendant and watched with the eye of a lynx everything she did in which other men were concerned and taunted her frequently with the fact that he had a blonde beauty who was waiting for him and would take up with him at any time. She gives much evidence of his intimacy with other women in ways that were at least questionable and indiscreet. She testifies that on one occasion she learned he had registered with another woman at the Palmer House in Chicago as G. B. Hengen and wife; that she went there and after some difficulty succeeded in gaining entrance into a bedroom where she found him and one Lillian Koch together. His account of this affair is to the effect that he became

acquainted with Miss Koch through the fact that her sister Florence was a stenographer in the employ of himself and a business associate in Chicago and that Lillian wanted to secure permanent employment and telephoned him to meet her at the Palmer House one evening about 7 o'clock for a conference on the subject. Without the knowledge of the defendant he went to meet that appointment and after conversing a while with the girl in one of the parlors of the hotel a great many people came in there for shelter from a sudden downpour of rain. He says it then occurred to him that it would not look well for him to be seen conversing with an unmarried woman under such circumstances and in such a place and to avoid the apparent impropriety he registered as B. B. Hengen and secured a private bedroom to which he took her. He claims that the door was open and the blinds up so that people could readily see into the room and that himself and the young woman were fully dressed. He is contradicted in material particulars by the defendant's evidence to the effect that the door was closed and locked and that when entrance to the room was effected after some delay he was found with his coat off. Another time the defendant went to his office and found the door locked, but could see through the frosted glass that he was walking back and forth inside. She also saw a woman moving around in the same room and after a time she secured admission and discovered him there with Lillian Koch and her sister. A scene ensued resulting in some uproar when he seized her violently and as she says dragged her across the room into an inner office. He admits quarreling with her and says he only pushed her into the room.

It appears that the friction between the two began almost immediately after the marriage. They seem

to have separated two or three times before the final disruption. She went one time from Chicago to Colorado. The plaintiff was asked:

"What was the cause of her leaving and what did she say when she left?"

He answered:

"We had our usual quarrels; she had nagged and nagged until we had a general row and it seemed that the only thing I could do was to get out and get away; the lease being pretty near up anyway, and the people had returned and wanted their flat, and we settled up there and she was going home to her people in Colorado and she left."

Speaking of an occasion in which he came home in an automobile he says:

"Mrs. Hengen immediately accused me of having the chauffeur drive me to a house of ill-fame, and I denied it and we had a quarrel and she got up and reared around.

"Q. What did she do?

"A. She holloed and I feared that the neighbors all through the block would come in.

"Q. Had you touched her or anything?

"A. I had not touched her. I finally made up my mind—I had some pride—I made up my mind if there was going to be a scene I would get out so the matter would not attract attention. And she ranted around there and I got up to go out and she tried to keep me from going out of the front door fifteen or twenty feet from where I stood and I shoved her aside a like that [indicating] and I went out and she screamed and before I got halfway downstairs people in the same building—(that entrance that I went out of I think served six people), so some of those people came out to see what the trouble was; I was well ashamed of having anything occur at my home that attracted attention and I went out and went away.

"Q. Did you strike her at that time?

"A. No, sir.

"Q. She claims her lips were cut and arms bruised.

"A. She fell against a book case in the hallway.

"Q. Did you strike her?

"A. No, sir. I pushed her away so I could go out."

Her story of this occurrence is that he knocked her down with his fist. A neighbor and his wife came in a few minutes after the plaintiff left on this occasion and testify that her lip was cut and bleeding and her arm was skinned and bleeding from the wrist to the elbow. He gives also the following testimony:

"Q. You do not claim that you are free from resenting these things when she accused you of them? You resented the accusations?

"A. I certainly did.

"Q. Did you call her any bad names?

"A. You know what you would do in a quarrel, you will say a good many things. I don't know that I used any profanity. You know what you would do when you have had a quarrel.

"Q. * * Would you say that she lied?

"A. Yes, sir; I may say she lied because she did lie. * *

"Q. Did you ever accuse her of adultery or anything of that kind?

"A. I don't think I did."

He admits going to Chicago Heights with Lillian Koch and this was one of the elements of the altercation in his office where he shoved the defendant into an inner room. He also concedes that he went alone to the Hilker residence to play cards with Mrs. Hilker and met her by appointment at a hotel in Chicago. There is much evidence of his being very attentive to a Miss Mills at various times in the afternoons and late at night. The defendant and her sister testify that Mrs. Hilker confessed to them that she had committed adultery with the plaintiff and as a result had

85 Or.—11

procured an abortion to be performed upon herself. It is said in *Wheeler* v. *Wheeler,* 18 Or. 261 (24 Pac. 900), that if a wife has reason to suspect her husband of infidelity it is not cruel or inhuman to charge him with it, citing *Kennedy* v. *Kennedy,* 73 N. Y. 374. From the plaintiff's own statements under oath it is plain that he was on several occasions guilty of at least questionable conduct with other women and gave his wife good cause to inquire about it. The whole married life of the parties seems to have been clouded with distrust and jealousy. Neither had confidence in the other and considering their antenuptial relations we cannot wonder at it. Parties who were guilty of the lecherous escapade to New York and return would most likely doubt each other when the sacred relation of husband and wife was consummated.

In *Beckley* v. *Beckley,* 23 Or. 226 (31 Pac. 470), speaking by Mr. Justice Moore, this court laid down the rule thus:

"To entitle one to a decree of divorce for cruel and inhuman treatment, the injured party must come into a court of equity free from the suspicion that he has contributed to the injury of which he complains. Divorces should not be granted by weighing the evidence and decreeing in favor of the one least guilty, where both have taken an active part in the mutual discord. Equity relieves the injured party, but not the vanquished. In the struggles for supremacy, or to vent spleen, spite or hatred, the willing actors may fight out the battles of wedded life, but they cannot invoke the aid of equity after their own efforts have failed."

It was also said in *Jones* v. *Jones,* 44 Or. 586 (77 Pac. 134), that where the plaintiff was a willing and active participant in the quarrels and assaults of which she complained she was not entitled to a divorce. On the principle that one who comes into a

court of equity for relief must come with clean hands the following precedents may be read with profit in this connection: *Taylor* v. *Taylor*, 11 Or. 303 (8 Pac. 354); *Adams* v. *Adams*, 12 Or. 176 (6 Pac. 677); *Wheeler* v. *Wheeler*, 18 Or. 261 (24 Pac. 900); *Mendelson* v. *Mendelson*, 37 Or. 163 (61 Pac. 645); *Crim* v. *Crim*, 66 Or. 258 (134 Pac. 13); *Matlock* v. *Matlock*, 72 Or. 330 (143 Pac. 1010). We do not attempt to justify the conduct of the defendant in her relations with her husband. She stoutly denies the charge of adultery against her. We do not find it necessary to further investigate that charge. Out of his own mouth the plaintiff states enough to show that he was a willing participant in their numerous quarrels and that he resorted to personal violence against the defendant at least twice. Whether he shoved her or struck her, it is practically without dispute that he inflicted severe injury upon her. The court will not differentiate between the terms used to designate his brutality or decide whether he struck or shoved her. It is enough to say that he is proved to be much in fault and that he does not come into chancery with that clear record which alone entitles him to relief.

1. The only remaining question to be considered is the defendant's demand for an additional allowance for the expense of defending the suit. The Circuit Court made its decree of divorce in favor of the plaintiff conditional on his paying the defendant $11,000. As amended by the act of January 31, 1913, Section 513, L. O. L., provides:

"Whenever a marriage shall be declared void or dissolved the court shall have power to further decree as follows:

* * "3. For the recovery of the party in fault, such an amount of money, in gross or in installments, as

may be just and proper for such party to contribute to the maintenance of the other."

In the preceding section it is said:

"After the commencement of a suit, and before a decree therein, the court or judge thereof may, in its discretion, provide by order as follows: 1. That the husband pay, or secure to be paid, to the clerk of the court, such an amount of money as may be necessary to enable the wife to prosecute or defend the suit, as the case may be. * * "

2–5. It is manifest that the granting of suit money is an interlocutory matter and is to be made only before decree and not afterwards. In this case the record discloses that the Circuit Court awarded the defendant $500 for this purpose, *pendente lite*. This exhausted the original jurisdiction on that subject. Of course this branch of the case might be reviewed on appeal on the authority of *O'Brien* v. *O'Brien*, 36 Or. 92 (57 Pac. 374, 58 Pac. 892), like any other question involved, except for the fact that there is no testimony before us about the amount or items of the defendant's necessary expenses in defending this suit. Any additional allowance, therefore, in this court would be arbitrary and without justification in the record. All these matters are controlled by legislation and the doctrine is taught in *Taylor* v. *Taylor*, 70 Or. 510 (134 Pac. 1183, 140 Pac. 999), that such allowances depend entirely upon the statute and unless there is an enactment authorizing it no money decree can be entered in a divorce suit against either party for any purpose. Moreover, the cash award to be made in a final decree is dependent upon the dissolution of the marriage or the declaration that the same is void. In other words, no alimony can be granted unless the marriage is dissolved or annulled. Even then the re-

covery must be from the party in fault. In this respect the decree of the Circuit Court was illogical and wholly at variance with the statute. If the plaintiff was the party in fault he was not entitled to a decree for the dissolution of the marriage. If he was not to blame he is not within the category of the code prescribing that the recovery of money must be from the party in fault.

6. It was earnestly argued at the hearing that the parties were irreconcilable; that it was impossible for them to live together in peace and that the defendant ought to take the $11,000 and let the decree stand. Incompatibility of temper, however, is not a ground for divorce under the laws of this state and to approve the money feature of this decree would be to say in effect that a divorce may be purchased by a party desiring it whether he is at fault or not. As we have shown by his own testimony, the plaintiff is largely deserving of censure in his conduct towards the defendant and is therefore not entitled to relief in a court of conscience. As alimony is grounded by statute solely upon the dissolution or annulment of the marriage relation there can be no allowance to the defendant where the divorce is denied. It is not necessary to consider the effect of the Illinois decree for the maintenance of the present defendant. If by mutual concessions and a forgiving spirit they cannot settle their differences the parties must work out a solution on some other basis than that disclosed in the record before us. The decree of the Circuit Court is reversed and the suit dismissed.

REVERSED AND SUIT DISMISSED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BENSON and MR. JUSTICE HARRIS concur.