Argued February 8, modified February 28, 1928.

# S. B. HILL *v.* MYRTLE HILL.

### (264 Pac. 447.)

**Divorce—Wife's Conduct in Leaving Husband, Induced by Husband's Wrongs, Held not "Desertion."**

1. In husband's suit for divorce on ground of desertion, conduct of wife in leaving husband to find home where she could secure peace and comfort, induced by husband's wrongful conduct against conjugal relationship, did not constitute "desertion" entitling husband to divorce.

**Divorce—Husband Seeking Divorce for Desertion, Guilty of Transgressions Against Family, Held not in Chancery With Clear Record Required for Divorce.**

2. In husband's action for divorce on ground of desertion, husband, having committed many transgressions against his family, did not come into chancery with clear record, which alone entitles wronged spouse to relief of divorce.

**Divorce—Evidence of Husband's Cruel Treatment Entitled Wife to Divorce Unless Wife was Wrongdoer or Condoned Husband's Acts.**

3. In husband's action for divorce, in which wife filed cross-bill for divorce, evidence of husband's cruel and inhuman treatment against wife entitled her to decree of divorce unless wife was wrongdoer or condoned husband's acts.

---

1. What is desertion, see notes in 119 Am. St. Rep. 617; 138 Am. St. Rep. 147. See, also, 9 R. C. L. 364. Separation as ground for divorce, see note in 49 L. R. A. (N. S.) 1034.

2. Recriminatory defenses, see notes in 15 Am. Dec. 211; 86 Am. St. Rep. 333. See, also, 9 R. C. L. 387.

3. Habits or course of conduct of spouse as cruelty, see note in Ann. Cas. 1918B, 480, 500.

**Divorce—Evidence Held not to Show Wife's Condonation of Husband's Wrongs Precluding Divorce.**

4. Where husband suing for divorce on ground of desertion wrote letter to wife who had instituted suit for divorce for husband's cruelty, stating that he had forgiven all he had against wife and desiring termination of divorce case, and wife's letters tendering husband condonation brought forth from husband plea for prompt dismissal of suit which was dismissed by wife, there was no condonation of husband's transgressions; there being no desire for resumption of conjugal relation, especially where husband filed suit for divorce against wife day after her suit was dismissed.

**Divorce—Evidence Held to Entitle Wife to Divorce for Husband's Cruel Treatment.**

5. In husband's action for divorce on ground of desertion, in which wife filed cross-bill for divorce on ground of cruel and inhuman treatment, wife, who had aided in acquiring family property, not shown to have condoned husband's transgressions or to have been guilty of misconduct, *held* entitled to decree of divorce.

**Husband and Wife—Property Settlement Between Husband and Wife is Enforceable in Equity Only to Extent That It is Just.**

6. Property settlement agreement between husband and wife is enforceable in equity only to extent that it is just.

**Divorce—Division of Farm Property in Settlement Between Husband and Wife Held Unenforceable as Unjust; Wife Being Entitled to One Third of Entire Property and Mortgage Thereon Being Obligation of Both.**

7. In husband's action for divorce, evidence that property allotted to wife in settlement was one-third size of property retained by husband, but had no ready market or implements of husbandry, and that entire family group was left with the wife to support, necessitating large mortgage on property, showed that settlement was unjust and unenforceable in equity against wife, requiring that entire property should be considered as husband's and one third allotted to wife; mortgage debt being considered obligation of both.

---

Divorce, 19 **C. J.**, p. 83, n. 32, p. 142, n. 52, p. 145, n. 62, p. 146, n. 77, p. 334, n. 47, p. 340, n. 71 New.

From Multnomah: GEORGE TAZWELL, Judge.

Department 1.

MODIFIED.

---

4. See 9 R. C. L. 380.
6. See 13 R. C. L. 1374.

For appellant there was a brief and oral argument by *Mr. Wm. A. Williams.*

For respondent there was a brief and oral argument by *Mr. W. C. Winslow.*

ROSSMAN, J.—This suit, instituted by the husband, seeks a divorce on a charge of desertion; the answer denies this charge, and by way of cross-bill seeks a divorce on charges of cruel and inhuman treatment. The complaint alleges that the property rights of the parties were previously settled; this the answer denies and alleges that the plaintiff owns real property of the value of $50,000, and that at the time of the alleged property settlement the defendant was mentally unfit to negotiate a settlement; it avers that the settlement was inequitable and unfair. The trial court denied relief to both parties.

The foregoing is sufficient as an introduction to the issues. There are no questions of pleading involved. The problems which we must solve may be stated as follows: (1) Does the evidence disclose that the defendant deserted the plaintiff; (2) does the evidence show that the plaintiff treated the defendant in a cruel and inhuman manner; (3) has the plaintiff's conduct been such that it bars him from the relief which he seeks; (4) did the defendant condone the plaintiff's acts; (5) if the defendant is entitled to a divorce is the property settlement valid.

No useful purpose would be served in spreading upon our reports a narrative of the unhappiness which attended the matrimonial venture begun by these parties when they were united in wedlock January 2, 1895. Plaintiff was then twenty-nine and defendant nineteen years of age. Five children have

been born to them, four of which, all daughters are
now living. When the marriage was consummated,
plaintiff, a farmer, was worth $10,000. When he filed
his complaint the two had accumulated real property
worth approximately $60,000. In addition the plain-
tiff was possessed of a bank account of $1,200; he had
horses, cows, sheep, hogs and farming implements.
He was a successful farmer, but his domestic life
brought unhappiness to himself, his wife and chil-
dren. The labor, toil and perspiration which in part
contributed to his success was freely shared by his
family. Plaintiff's brief describes the defendant as
"not a very large woman," and pictures the defendant
as "almost a giant," yet the defendant testified:
"Many is the day I have raked with one baby in my
arms, and one sitting on the rake by me." The chil-
dren apparently contributed their full share of labor;
the plaintiff in referring to one of his daughters testi-
fied: "She drove the team and went around there like
a man all summer. She wouldn't do anything else;
she drove a binder and she drove a mower and every-
thing. When there was any gravel to haul, she was
Johnny-on-the-spot." The other children performed
similar labor; they cleaned the cow barns, milked the
cows, herded the sheep, assisted in taking care of the
grain and hay, and helped to perform the many
chores which present themselves in farm life. The
result of all this toil, and the application to it of
plaintiff's vigor and intelligent efforts, was the accu-
mulation of the considerable estate we have pre-
viously mentioned. Had the plaintiff been possessed
of the same degree of affection and concern for his
family which he displayed toward his broad acres and
rows of waving grain, his property accumulations
would be enriched by the affections of a family gath-
ered about him. But in lieu of that, we find much

profanity, filthy language, frequent accusations of infidelity made against his wife, loose talk wherein he denied his paternity of two of the children; frequent instances wherein he charged that his wife was insane; much evidence of bad temper and a stormy disposition. To these the evidence adds many instances of cruelty to his livestock. The manifestations of his ill temper and bad disposition did not reveal themselves upon remote occasions only, but the evidence shows that they displayed themselves almost continuously. Thus one of his daughters testified: "We were always terrified,—we were always in terror, and we always dreaded when he would come into the house." In referring to plaintiff's attitude toward his wife, the witness continued: "He would swear at her and rave, and at the table we would—there was nothing in the way of table conversation, because we were always in terror, * * " One of the plaintiff's nieces testified:

"Well, he was—he would get pretty mad, you know, and rave around,—what you might call a bad disposition; well, he was just sort of ill-natured was the worst part of it, just sort of all the time not very pleasant, not very pleasant at all, in fact."

The witness then added:

"I knew he had always been awfully cross and hard to get along with, and I wasn't surprised when they finally left him, * * but after I heard of that, I thought I would write to him. I always cared for him, because he was my mother's brother. * * "

Then the witness related some of the statements which the plaintiff made concerning his wife:

"Well he told me that she was impure, and that she had confessed to him that she was not pure as a child with her father, had ruined her character, and he said he didn't think she was very intelligent and

he did not think the children were, and that her family weren't, and stuff like that."

To others he made like statements. The evidence disclosing the unhappy situation in the household, together with the plaintiff's treatment of his family and of his livestock, came not alone from his wife, but her testimony was amplified, supported and corroborated by the plaintiff's former brother-in-law, two of his nieces, one of his former employees and three of his daughters. Indeed, the plaintiff does not deny the unhappy situation that prevailed in his home; in part he places the blame in a vague sort of manner upon his wife; but with frankness which would be credible in a repentant sinner, he acknowledges much of it as the product of his own fault. In one part of his testimony in referring to his conduct, he testified: "I never got any better, and I could not get any worse"; again he said: "Sure, I am no angel; I don't pretend to be one." His answer to another question, wherein he referred to his wife by her maiden name of Bradford (she being a descendant of Governor Bradford of the Plymouth Colony), was the following: "As I said before, you know, the Hills is all kind of cranky and the Bradfords is all kind of crazy and I guess it made kind of a bad combination." The specific acts of unhappiness that occurred in the household, it is unnecessary to relate. It will suffice to add, that the son left home when he was sixteen years of age. Later the defendant left, and with her went the three unmarried daughters and one of plaintiff's nieces who had been making her home at their household. Thus the defendant was left alone.

There is ample testimony showing the effect upon the defendant of the foregoing life. One of the

124 Or.—24

daughters testified: "My mother became almost a nervous wreck, * * he called her pop-eyes because her eyes stared so." Another daughter testified: "She was in such dire terror all the time that her eyes got so big, and she worked so hard that they protruded; he called her pop-eyes; he said, 'You old pop-eyes, you need not bring any of that old Bradford stuff up here.'" On one occasion the situation became so unbearable that the defendant sought to escape from it by taking five morphine tablets. She testified that death almost seemed like a privilege. The situation apparently affected both of them for on one occasion the plaintiff seized a gun; in order to impress his wife with the force of his argument he struck the wall so hard with the gun that he broke both the gun and the wall. Upon another occasion, the plaintiff was administering some punishment to a child, giving it what he, as a witness, termed a "whaling"; the defendant's overwrought nervous condition caused her to seize a gun and she fired in the plaintiff's general direction, thereby causing him to flee.

The separation which followed the act of defendant and her children leaving the family home was not a complete one; the testimony discloses that from time to time the parties lived together for short periods. On October 5, 1920, while the parties were living more or less apart, they subscribed their signatures to a property settlement agreement, whereby it was stipulated that the plaintiff should have the Jefferson ranch of 320 acres where the family resided prior to separation, and the defendant should have as her property the Swegle place of 105 acres where the defendant now resides. The former place was free from debt and apparently well adapted to farming purposes. The latter place was encumbered with

a mortgage of $1,000; it was agreed that the defendant should assume this debt and also an indebtedness arising from the operation of this place.

We come now to an incident which the plaintiff claims began the period of desertion: September 22, 1922, the plaintiff and defendant were in an automobile bound for the state fair. While driving through the City of Salem two of their children passed them on the sidewalk. The plaintiff became very angry because the children refused to recognize him. The testimony does not agree upon all of the details which then transpired, but we believe it supports the conclusion that in the heat of his anger the plaintiff demanded that his wife should leave the automobile; the defendant sought to allay his wrath, but being unable to do so, left the automobile. Thereafter the parties did not resume living together and the plaintiff made no requests for the defendant's society or cohabitation.

In May, 1924, the defendant instituted a suit for divorce in Marion County, in which they had resided for many years. Thereafter some discussion took place between the parties, which satisfied the defendant that it would be desirable to endeavor to resume their matrimonial relations. The result was that on December 10, 1924, the defendant wrote to plaintiff a. very friendly note, which was followed on December 16th by the following letter:

"I am writing you to let you know that I feel that I have come to the conclusion that this divorce has dragged along so we would come to our senses. I sincerely and truly am done with it and I have forgiven all I ever had against you and I desire to do all I can for you. A change has come into my heart and I have put away all the hard feelings I have had. I

cannot forget you and I want you to be saved in the Kingdom of God, and I will do all I can to help you. I have been praying for you and I love you and want you for my own. If we love Jesus there is no reason why we can't get along. The Savior is so soon to come in power and great glory, let us get ready for him together. Love from Myrtle."

On the same day she wrote to Mr. W. C. Winslow, plaintiff's attorney, the following letter:

"I am writing a few lines to you in regards to my divorce. On account of the way Mr. Hill has acted and treated us, I have been very disappointed in him and angry and have desired to have a divorce and be done with him forever. But the last few days a great forgiveness and love for him have taken all bitterness out of my heart and I only desire to have his soul saved and I cannot go on with this divorce as I don't care for it at all. I only desire a reconciliation, if such a thing is possible, and I believe in prayer and I know the Lord can help Mr. Hill to do right, so I come to you * * to see what you can do with him. I feel he needs his family in his old age and I am sorry he has felt so bitter towards us. I am praying for him to be a Christian, then all will be well.

"Sincerely,
"Mrs. M. HILL."

To her own attorney, Mr. Heltzel, she sent the ensuing note:

"Well I am sending you a new phase of my troubles. You know how very anxious I have been to get this divorce over with. Well I meant it all right but I have changed since I saw you last and I am broken hearted over this whole affair. I don't want a divorce, I feel only sorrow for the past and I freely forgive Mr. Hill for all he has done to me and I only desire to do what is right and live a true Christian

life and I will do anything to get along with him if possible. See what you can do and fix this up.

"Sincerely,
"Mrs. M. HILL."

These letters brought forth from the plaintiff the following reply:

"Received your letter stating you were thinking of giving up the lawsuit; also the letters you wrote Heltzel and Winslow; had a talk with my attorney; he said you had not dismissed the case as yet. If you want to quit, why in the name of Heaven don't you order your lawyer to have the case taken off the court records?"

January 6, 1925, the defendant asked for and was granted an order dismissing her suit.

It is the expressions of forgiveness contained in the foregoing letters that the plaintiff relies upon for a condemnation; while upon the document of October 5, 1920, he relies as a property settlement. When the defendant established herself upon the Swegle place, she found it bare of all farm implements; there was no seed grain with which to plant a new crop, with the result that she was compelled to purchase seed grain, which she did from the plaintiff, although the agreement stipulated that she should have "all the personal property thereon, including the grain and hay * * ." At that time the plaintiff made the following prediction to one of his daughters: "He told me himself—when I was down there—that in a few years she would be practically—she would be up against it and she would be in the asylum, or somewhere else." As a witness he admitted that he probably related this prediction to his daughter and that he felt she could not make a success of the Swegle place. Living with the defendant on this place were

the three unmarried daughters, a widowed daughter, two grandchildren, a niece of the plaintiff, and the plaintiff. There was already a $1,000 mortgage upon the place and some outstanding indebtedness. To obtain money with which to equip the place and pay for the seed grain, the mortgage was increased, and later was again increased. The money borrowed by the defendant was used by her in assisting the children in the purchase of clothing and in obtaining an education. The debt is now $9,000. Interest charges and taxes consume so much of the income, that there is but little left for the plaintiff and those dependent upon her.

As we have seen, January 6, 1925, the defendant obtained an order dismissing her suit against the plaintiff; January 7, 1925, the plaintiff began the present case by filing his complaint in Multnomah County.

1-4. We come to the question, Is the plaintiff entitled to a divorce upon his charge of desertion? We do not believe that the defendant deserted plaintiff; she like the three unmarried daughters, his niece and his son, are undeserving of the epithet ''deserter''; they left to find a home where peace and harmony would enable them to secure comfort; such conduct, when induced by the other's wrongs against the conjugal relationship, does not constitute desertion. Be this as it may, surely plaintiff's many transgressions against his family do not enable him to come into chancery with that clear record which alone entitles a wronged spouse to the relief of a divorce: *Hengon* v. *Hengon*, 85 Or. 155 (166 Pac. 525); *Carmichael* v. *Carmichael*, 106 Or. 198 (211 Pac. 916). It follows that the plaintiff is entitled to no decree, and from our findings previously set forth, it follows that the

defendant is entitled to a decree against the plaintiff unless she has been a wrongdoer or condoned his acts. It would seem that the law was incongruous indeed, if it held that the plaintiff's transgressions had now been forgiven, when in fact the sinner was in no sense repentant, but employed the occasion which tendered him remission as an opportunity to gain for himself an advantage over his mistreated wife. Such a sacred occasion should not be desecrated by using it for the purposes of deception. The wife's letters which she believed would bring her husband comfort, and which tendered him condonation, brought forth from him a plea for a prompt dismissal of the suit. Hardly was the ink dry to the judge's signature upon the order of dismissal than the plaintiff filed suit for divorce in a county where neither was known. Evidently, while the plaintiff was penning her words of remission, and thinking in terms of a resumption of the family relationship, the plaintiff was engaged in drafting a complaint for divorce. Condonement does not arise out of such a situation. Its primary element is missing, that is, a desire for the resumption of the conjugal relationship. Thus this court in *Saville* v. *Saville*, 103 Or. 117 (203 Pac. 584), said: "Condonation is the forgiveness of a matrimonial offense upon the condition * * that the offender will thereafter treat the injured spouse with conjugal kindness." In Keezer, Marriage and Divorce, Section 425, we find: "Condonation is forgiveness. It is forgiveness based upon the presumption and belief that the guilty party has repented; but, if the subsequent acts of the guilty party show that there was no repentance, it is not a bar." The Alabama court in *Quarles* v. *Quarles,* 19 Ala. 363, said:

"We have been referred to no case, and we presume none can be found, which holds that a proposition made by the wife, who has been driven by the cruel and barbarous treatment of her husband from his house, again to return, but which he indignantly spurns and rejects, shall be regarded as a condonation of his cruelty. This prudent but rejected offer should not prejudice her rights, more especially when it does not appear that the husband has ever repented, or changed his determination to render her a perpetual outcast from his house and society," and of course her offer of condonement was not accepted.

In Schouler, Marriage, Divorce, Separation and Domestic Relations, Section 1695, we find: "According to the weight of authority an accepted offer to resume intercourse is unavailable to the offender as amounting to condonation, until that offer is accepted."

5. It follows from the foregoing that the plaintiff is entitled to a divorce. Only one circumstance would deter us from arriving at this conclusion; that is, the able trial judge who heard the presentation of the evidence denied the decree to both parties. He, however, placed his conclusion upon the premise, that society will be "better served by their remaining husband and wife * * to want a divorce at their age is something I cannot understand, even though they may be as wide apart as the poles, so far as living together is concerned; but the state is more interested in preserving a marriage * * ." We have a woman who has borne five children, reared the four now alive in a manner that caused the trial judge to describe them as "properly and well brought up and treated"; in addition she has helped create the estate which should now afford opportunity for relaxation. The defendant has performed her full duty, and

should now be in a position to enjoy the fruits of her labor. In lieu of that, the decree of the lower court presents us "man and wife coupled together for the sake of strife"; we believe that the defendant is entitled to a decree of divorce.

6, 7. We are not unmindful of the fact that the defendant was not a perfect wife; she participated in some of the arguments, and there is testimony to the effect that at times her language was profane; but, it is difficult for ordinary mortals to constantly observe all of the proprieties of society, when over a long period of time the better elements of human nature are annoyed, aggravated and at times outraged. We have also borne in mind the fact that when man and woman are united in wedlock each must be charitable of the faults and shortcomings of the other. It is in this relationship that all of the limitations of human nature at times reveal themselves in their most unpleasant form. No woman is entitled to a perfect husband; but, this husband even as a witness was not inclined to spare the wife's feelings. We believe she is entitled to a divorce. Does the property settlement agreement bind her so that she is entitled to nothing more than the Swegle place and the Salem lot? To the latter the plaintiff has not executed a deed. The solution of this problem depends not necessarily upon the validity of the agreement, but upon its enforceability. The authorities are to the effect that the agreement is enforceable in equity only to the extent that it is just: *Halstead* v. *Halstead,* 74 N. J. Eq. 596 (70 Atl. 928); *Buttlar* v. *Buttlar,* 71 N. J. Eq. 671 (65 Atl. 485); *Montgomery* v. *Montgomery,* 41 Okl. 581 (139 Pac. 288). When the agreement was executed, both properties were apparently of approximately the same

value; whatever difference in value existed was in favor of the Jefferson farm which the plaintiff retained. In addition it was stocked with implements, seed, harness and horses. Its area was three times as great as that of the Swegle place and commanded a more ready market. That which went to the defendant was bare of all the necessary implements of husbandry and there was no market for it unless the owner divided it and sold the subdivisions on an easy installment plan. As we have observed before, the plaintiff predicted that the defendant would be unable to earn a living upon her farm. In addition we have the circumstance that he removed some of the personal property which should have been left there. Likewise the entire family group, with the exception of the plaintiff, fell to her lot to support. The circumstances which we have outlined convince us that it would be unjust to enforce the agreement against her. There is no evidence to the effect that she has dissipated any of the money derived from the mortgage, or has failed to maintain the property in a proper manner. We are of the opinion that the two farms, together with the Salem lot, should be considered as the plaintiff's properties, and that to the defendant should be awarded a one-third interest therein; the mortgage debt of $9,000 should be considered the obligation of both; the decree should allow the defendant the sum of $1,000 alimony which she may use in part to defray the expenses of this litigation; it should also allow her her costs. The lower court will enter the proper decree.          Modified.

Rand, C. J., and Bean and McBride, JJ., concur.