Delmar E. COTE, Appellant,

v.

Anne M. COTE, Appellee.

No. 14456.

Court of Civil Appeals of Texas.

San Antonio.

April 27, 1966.

Melvion R. Luter, San Antonio, for appellant.

Tom H. King, San Antonio, for appellee.

CADENA, Justice.

Delmar E. Cote appeals from the judgment of the trial court granting his wife, Anne M. Cote, a divorce on the ground of cruelty, awarding her custody of their minor child, and decreeing a division of their community property.

Appellant's first contention is that the evidence was insufficient to support the judgment of divorce.

Since the decision of Chief Justice Hemphill in Sheffield v. Sheffield, 3 Tex. 79 (1848), it has been recognized that the ill treatment of one spouse by the other may be of such a nature as will render their further living together insupportable, even in the absence of personal violence, and that a series of vexations and deliberate insults and provocations can, under our statute, constitute grounds for divorce. There are innumerable acts or combinations of misconduct which can amount to cruel treatment under the pro-

visions of Article 4629, Vernon's Ann.Civ. St. Counts v. Counts, Tex.Civ.App., 358 S.W.2d 192, wr. dism. The reaction to a course of misconduct is strictly personal to the aggrieved spouse, and conduct which produces no mental distress or anguish to one person may amount to an insupportable burden to another person of different sensibilities. Daughtry v. Daughtry, Tex. Civ.App., 312 S.W.2d 957, no writ. Each case must be determined upon its own facts, so that generalized statements from other cases are of little help.

The record in this case reflects a situation where the wife was earning in excess of $800.00 a month. The husband was engaged in the operation of an incorporated business, from which he drew $380.00 each month. The husband's earnings fell short of meeting the monthly expense of maintaining the home of the parties by more than $200.00 per month, although he testified that he had always been able to support his family and that his wife worked merely because she wanted to.

From the evidence which we shall presently summarize, and from his observation of the parties while on the stand, the trial judge was justified in concluding that the husband deeply resented the superior earning ability of his wife and, as a result, adopted an attitude which was necessarily disruptive of conjugal harmony. It is, of course, not unusual today for married women to be gainfully employed, nor is it unheard of for a wife to earn more than does her husband. Even in cases where the wife is employed, it may be that in the majority of cases the husband, nevertheless manages the financial affairs of the family. But the evidence here supports the conclusion that the husband assumed an unusual and uncongenial "watchdog of the treasury" attitude.

When the husband discovered that, from her salary of $800.00 per month, his wife was setting aside the monthly sum of $25.00 for the purpose of buying her own clothes and other personal needs, he turned white

with anger and accused her of "stealing" his money. On many occasions, he disparaged and belittled his wife in public. Despite the fact that her earnings constituted better than 70% of the family's income or, perhaps, because of that fact, he often described his wife in public, and in her presence as an elephant, an ox and a stupid person. He objected when his wife's friends visited her in her home. On one occasion, when a member of one of his wife's clubs called on the wife to urge her to run for president of the organization, he ordered the visitor to leave, telling her that he did not appreciate having his wife's friends coming to his house to talk to her. When the wife made the rather predictable comment that it was as much her house as his, he retorted that if she did not like it she "could pick up and leave."

On the very day when, according to his testimony, his wife accompanied him to the office of a lawyer for the purpose of making an effort to resolve their difficulties and attempt a reconciliation, he closed her charge accounts without telling her about it. Less than a week before the parties separated he withdrew, without informing his wife, in excess of $2,100.00 from a savings account which they were accumulating for the purpose of educating their child, leaving a balance of only $100.-00. When first questioned concerning this withdrawal he categorically denied it, but after the records of the banking institution had been introduced in evidence, he admitted the fact. $1,400.00 of the amount so withdrawn was used by him to pay off the outstanding indebtedness on his car and the remainder, according to his testimony, he "spent for different things" which he did not identify.

The wife had been, for some time, a director of the company which her husband operated. About four months prior to their final separation a meeting of the board of directors was held, apparently without the wife's knowledge, and at this meeting she was removed as a director. She was never informed of this action of the board and first found out about it at the trial.

Mrs. Cote testified that the strain of living with a husband who often insulted her in public and who accused her of stealing money which he described as his, although she had earned it, kept her constantly nervous and upset. When she developed an ulcer her husband responded, not with expressions of sympathy and solicitude, but with reproaches. His reaction was: "I don't know why you have one. I'm the one that should have one. You don't have any reason to have an ulcer."

■ The conduct of the husband in this case goes beyond the mere arguments and spats which have been said to be an unavoidable part of married life. The husband treated his wife as a subordinate, not a partner, and followed a course of action designed to impress on their friends and acquaintances that she was incompetent and stupid. The trial judge was justified in finding that this course of conduct, when directed toward a woman whom the judge observed and whose sensibilities, character and personality he had an opportunity to evaluate, was of such a nature as to render the further living together of the parties as man and wife insupportable.

Appellant contends that, even if it be conceded that his course of conduct was of such a nature as to justify the granting of a divorce to the wife, she cannot rely thereon since, by continuing to live in the same house with him, she condoned such conduct.

In his answer to the divorce action appellant did not plead the affirmative defense of condonation. The wife's testimony did show that the misconduct of which she complained spanned a relatively long period of time.

In Thomason v. Thomason, Tex.Civ. App., 332 S.W.2d 148, no writ, the Court stated that, although the best practice is that the affirmative defense of condona-

tion should be pleaded, the trial court should consider such evidence even in the absence of such pleadings. In support of this statement, the Court cited Barta v. Barta, Tex.Civ.App., 283 S.W. 201, wr. ref., and Crittenden v. Crittenden, Tex. Civ.App., 214 S.W.2d 670, no writ.

Neither the Barta nor the Crittenden case supports the conclusion reached in Thomason. In Barta, the opinion of the Court expressly recites that the defendant had affirmatively pleaded the defense of condonation, although the averment of condonation was in the form of a conclusion, without allegation of specific facts upon which defendant relied. Nevertheless, although apparently no special exceptions were filed by plaintiff, the Austin Court said: "Condonation has been generally held to be an affirmative or special defense, requiring the facts upon which it is based to be specially pleaded. Wright v. Wright, 6 Tex. 3; Nogees v. Nogees, 7 Tex. [538,] 539, 58 Am.Dec. 78. * * * A plaintiff in a divorce suit is certainly entitled to be informed as to the facts the defendant bases an allegation of condonation upon before the trial, in order to be prepared to meet the issue with proof. In passing, we make mention of this matter so that appellee may amend in this particular, if he desires to do so in the event of another trial of this case." 283 S.W. at p. 202.

Barta, then, far from holding that condonation need not be pleaded affirmatively, is authority for the proposition that, in order for the defense to be available, the particular acts asserted to establish condonation must be specifically set forth.

In the Crittenden case defendant argued that the evidence established, as a matter of law, a condonation of the alleged cruelty. The Galveston Court, after stating that condonation is an affirmative defense which must be pleaded, went on to say that it could "not hold that the trial court erred in refusing to sustain an affirmative defense which was not pled." 214 S.W.2d at p. 671.

■■ In any event, we do not believe that the evidence in this case established condonation as a matter of law. The record discloses that for several months the parties were barely on speaking terms. The wife testified that for several years she had tried to hold the marriage together for the sake of their child, and that she deliberately delayed filing suit for divorce from August, 1964, until January, 1965, because she deemed it in the best interest of the child to try to keep the family together until after the Christmas season. Further, condonation involves not only the concept of foregiveness by the offended party, it also proceeds on the idea of repentance by the offender, and it is not operative where subsequent events show that no repentance, in fact, existed. Absent evidence of repentance, evidence indicating that the offender did not repent indicates that the offended party did not condone. Armstrong v. Armstrong's Adm'r, 27 Ind. 186; Hill v. Hill, 124 Or. 364, 264 P. 447; Rushmore v. Rushmore, 174 A. 469, 12 N.J.Misc. 575, aff'd, 117 N.J.Eq. 451, 176 A. 142.

■ Here, as in many cases involving cruelty, the misconduct of the defendant consisted of a series of acts committed during a substantial period of time. In such cases, the conduct of the defendant would not in any single instance, perhaps, constitute a ground for divorce. It is the continuity and persistence of the conduct that ultimately gives the plaintiff a cause of action. If continued living together is to be treated as a condonation, then a spouse who hopes for an improvement in conduct and, buoyed by such hope, continues to live with the offender, is, by the very act of tolerance, barred from securing a divorce. Tolerance by the offended spouse is to be encouraged rather than punished. "Condonation for repeated acts of cruelty and indignities will not be inferred from toleration and association afterwards." Arnold v. Arnold, 222 S.W. 996 (Mo.).

■ We cannot say that the trial court erred in concluding that the husband here never repented. His actions, shortly before the parties separated, in closing the wife's charge accounts, without her knowledge, and in practically depleting their savings account, without her knowledge, support the conclusion that his heart was free of repentance and that his attitude toward his wife had not changed. His part in the surreptitious removal of his wife as a director of the company which he operated, although it may, perhaps, not be classified as cruel treatment since he concealed his action from her, further evidences a persistence of his hostile attitude. In this state of the record, we cannot say that the trial court abused its discretion in refusing to sustain a defense which was not pleaded. Crittenden v. Crittenden, supra.

■ Finally, appellant asserts that the judgment rendered by the trial court relating to the division of the community property does not conform to the judgment which it announced from the bench at the conclusion of the trial. Appellant's principal complaint appears to be that although the trial judge stated that an appraisal would be made of all the community property, the record fails to disclose the fact that any appraisals were presented to the court.

The judgment in the record recites that each party shall pay one-half of the court costs, which "shall include any and all appraisal costs incurred in this proceeding." The judgment then describes the amounts of "said fees" and names the persons to whom they shall be paid.

These recitals are sufficient to show, on the face of the judgment itself, that the community property of the parties was in fact appraised. We must conclude that the trial judge, in making the division of the community property, considered such appraisals. Since appellant does not contend that the division of the property was not fair and equitable, there is no basis for disturbing the trial court's action.

The judgment of the trial court is affirmed.

MURRAY, Chief Justice.

I do not concur with the opinion of the majority.

Appellant's first point is that the evidence is insufficient to support the judgment of divorce, and that appellee failed to establish her allegations by full and satisfactory evidence.

Anne M. Cote was called as a witness and by her evidence, in my opinion, she failed to establish grounds for divorce. She testified that she and her husband had been talking of a divorce for several years, and this past August (Aug. 1964) it was finally discussed, but she did not want to take any action until after the holidays. She knew that unless the family was kept together during the holidays it would be very upsetting to their twelve-year-old son, Dennis. She was asked by counsel what prompted the suit for divorce, and she answered: "Well many, many different things have prompted me over the years. The way he has treated me, and I just hate to go into everything, but just recently, after we had our discussion at Carol's office * * * I went back to my office, and went to work, and he left me. I don't know where all he went, however, he was very busy cutting off all of my credit at Sears and Joskes." The record shows that Anne earned some $825.00 per month as an employee of Emerson & Company, and that her husband, Delmar Cote, drew the sum of $380.00 out of the floor covering company that was owned by him and others. Anne undertook to testify that Delmar had drawn $2,110.48 out of an account they had with the San Antonio Savings Association, but an objection was offered to this testimony and was sustained. The fact was later established by an officer of the Savings Association. The account was supposed to

be for their son's education. She had requested, a number of times, that the account should be carried in her name as well as his, but Delmar refused. He wanted everything in his name.

Mrs. Cote admitted that she and Dee, as she called her husband, had breakfast together on the morning of January 13, 1965. She prepared the breakfast and she, Dee and their son, Dennis, ate together. As to what conversation took place, she said there was none. She simply told him breakfast was ready and he came in and ate. Dee went on to work and was served a little later that morning with a citation in the divorce case and a temporary injunction.

Mrs. Cote testified that on the surfaee she and Dee had a tranquil and peaceful marriage because she did not like to argue. She would usually do anything to avoid an argument. She had been hospitalized during their marriage for tension and it was discovered that she had a duodenal ulcer. This took place in August, 1961. Mrs. Cote was asked, "And, did you ever get ill again?" She answered: "Yes, I had strep throat in November, 1965 (the date is in error, the trial was in April, 1965), which I suffered after effects from, and developed a painful lump in my leg, and in, and I was three weeks off from work, and for quite sometime I was pretty disabled, for at least three months, and * * * (she undertook to say what the doctor told her, but it was excluded by the trial court)."

She testified that during these times she was "most nervous" and "constantly upset." She was then asked, "And why were you constantly upset?

A. Because I was having to face Dee every day, and try and get along with him, I tried everything to keep our home together for Dennis' sake.

Q. As time progressed, and as the fall of 1965 came along, what was the condition of your marriage with regard to arguments and tranquility around your household?

A. We had fewer arguments than before, because we weren't speaking very much.

Q. I see. Why were you all not speaking?

A. Because it had just come to the point where he knew my feelings on the subject, and he wanted to make an agreement to where maybe we could work things out for Dennis' sake. I said, I have been trying for ten years to keep the home together for Dennis' sake, and all it is doing is upsetting me.

Q. I see. Now, when did you all have your first discussion about a divorce? I'm speaking specifically about the situation in January of 1964?

A. That was in August.

Q. You said there was a discussion about a divorce in August?

A. Yes.

Q. * * * From your first discussion about a divorce in August, did your attitude relative toward the marriage change since then?

A. Did my attitude change?

Q. Yes, did your's?

A. No, it did not.

Q. Well, did Dee's attitude change at any time?

A. Yes, it did, because he was so over nice to Dennis, especially, and we—I even called him down one time about Dennis, and he said, 'well, I realize I won't have him very long. I know what the Texas law is, and I want to do everything I can do to cause his favor, if I have the opportunity.'

Q. What was his relationship with Dennis prior to this time?

A. Well, sometimes he would get out and play ball with him like any father would, and he did coach the team Dennis

was on, but usually he was too busy or couldn't be bothered, or just as if it was too much trouble.

Q. What has his attitude become since this—since this matter of divorce came up?

A. Well, he has, I feel sure, done everything possible to try and win Dennis. * * *

Q. Have you noticed any difficulty with Dennis after Dennis is with Mr. Cote?

A. Absolutely. He is extremely belligerent. He does not want to do anything I tell him to do. He is very hard for me to handle, and I have even had to talk with one of his teachers at school, who has problems with him.

Q. Does Dennis—does Dennis berate you?

A. When he comes back from being with his father on several occasions he has, and he is a very sensitive, lovely normal child, and does not ordinarily act like that.

Q. Do you try to be normally strict with him, and try to guide Dennis?

A. I am the one in charge of his upbringing, and of course, I have to be strict with him.

Q. Going back to the situation in January of 1965, just prior to this divorce being filed, what brought you to the realization to file this divorce?

A. Well, after I realized Dee was just pressing money, for every penny he could get out of me, and he made the remark earlier, I never had to work, and that is not so, because I went—I always said I would never work after I started my family and when we moved back here from Corpus we were paying rent here and on our house there, and he wasn't making very much, and he was so unpleasant to live with, he said he just didn't know how he was going to meet the bills. 'I don't know how I'm going to

meet them,' and finally I said, 'you know, I said I didn't want to work after I started my family'—

Q. Just a minute—

A. But I told him if it would help I would go back to work for a while.

Q. Let me interrupt at that point. As I understand you said you went to work because it was necessary to keep your family financially solvent?

A. It was absolutely necessary."

Mrs. Cote testified that Dee had insulted her in public by calling her an "elephant and ox" and telling people she was stupid. She further testified he threatened to do her bodily harm. "He has grabbed me and twisted my arm, and I had blue spots as a result, but he would not strike me. After he struck me years back, I told him he better not ever lay a hand on me again." She stated that on one occasion he had bluntly ordered a friend of hers to leave the house.

"Q. Did you ever argue with your husband, or promote an argument with him, to your knowledge?

A. I didn't pick any arguments with him. On occasion we would argue about Dennis, because he was so rough with Dennis, and then, almost all of our other arguments were over money.

Q. Do you know of anything you have done, which has caused this condition to arise which led to your seeking this divorce?

A. No."

Mrs. Cote admitted on cross-examination that she had gone out at night with her sister-in-law, and had seen a man whose first name is Dan, and that they had one or two intoxicating drinks together, and that she did not return home until after midnight. This occurred both before and after she and Dee separated. She had told Dee that she "had learned to almost hate him quite sometime back, and he was

very aware of the past, and he knew I didn't love him." Most of their misunderstandings were about money.

Article 4632, Vernon's Ann.Civ.St., provides in effect that a divorce can only be granted upon full and satisfactory evidence, whether contested or not.

Appellee seems to take the position that appellant having agreed to withdraw his contest of the divorce cannot now be heard to contend that the evidence relating to the grounds of divorce were not supported by full and sufficient evidence. Whether or not appellant agreed to withdraw his opposition to or contest of the divorce is immaterial because, in any event, the court is prohibited from granting such divorce unless the grounds relied upon are established by full and satisfactory evidence both to the trial court and to the Court of Civil Appeals. Art. 4632 reads as follows:

"No suit for divorce shall be heard, or divorce granted, before the expiration of sixty (60) days after the same is filed. In divorce suits the defendant shall not be compelled to answer upon oath nor shall the petition be taken as confessed for want of answer, but the decree of the court shall be rendered upon full and satisfactory evidence, upon the judgment of the court affirming the material facts alleged in the petition. Either party may demand a jury trial."

Bell v. Bell, Tex.Civ.App., 389 S.W.2d 126; Hausladen v. Hausladen, Tex.Civ.App., 388 S.W.2d 952; Meyer v. Meyer, Tex.Civ. App., 361 S.W.2d 935; Gordon v. Gordon, Tex.Civ.App., 359 S.W.2d 134; Schyrock v. Schyrock, Tex.Civ.App., 353 S.W.2d 50.

Appellee's divorce was sought on the grounds set out in Sec. (1) of Art. 4629, Vernon's Ann.Civ.St., reading as follows:

"(1) Where either party is guilty of excesses, cruel treatment, or outrages toward the other, if such ill treatment is of such a nature as to render their living together insupportable;"

Parties cannot be divorced for incompatibility, or because they live unhappily together, for marital wranglings, or merely because they possess tempers. McNabb v. McNabb, Tex.Civ.App., 207 S.W. 129.

Before cruel treatment can be held to be of such a nature as to render the further living together of the spouses insupportable, it must be unendurable, intolerable, insufferable. Solis v. Solis, Tex.Civ.App., 317 S.W.2d 237; Ballard v. Ballard, Tex.Civ. App., 186 S.W.2d 294; Rowden v. Rowden, Tex.Civ.App., 212 S.W. 302.

The burden of proof was upon Mrs. Cote to show not only by the preponderance of the evidence but, further, by clear and convincing evidence, to the satisfaction of not only the trial court but also of this Court, that her husband had been guilty of excesses, cruel treatment or outrages toward her of such a nature as to render her further living with him as his wife unendurable, intolerable and insufferable. This, in my opinion, she has not done. She says that her husband struck her many years ago and she warned him not to let that happen again, and he has not done so since. She said that at one time he grabbed her by the arm and twisted it, causing blue spots. She did not state when this happened or under what circumstances it occurred. It could have been a friendly scuffle that happened many years ago, so far as this record shows.

Mrs. Cote was hospitalized for tension and they found she had a duodenal ulcer. She was asked what caused these troubles, but she did not answer, objection having been sustained to her attempted answer. She also suffered from a strep throat. She could hardly blame this on Dee. She said she was constantly upset, and when asked why, she replied: "Because I was having to face Dee every day and try and get along with him. I tried everything to keep our home together for Dennis' sake."

Appellee has not shown herself so free from fault, and appellant so guilty of excesses, cruel treatment or outrages toward

her, unprovoked by her in any way, as to render their further living as man and wife unendurable, intolerable and insufferable.

In my opinion, the trial court erred in granting Mrs. Cote a divorce upon the evidence in this record. I would reverse the judgment and deny the divorce.