.HOWARD E. GREIMS, petitioner below, appellee and cross-appellant,

*v.*

JENNIE E. STANNEY GREIMS, defendant below, appellant and cross-appellee.

[Argued March 8th, 1912. Decided June 20th, 1912.]

1. A husband condones his wife's adultery by continuing marital intercourse with her after knowing of her offence.

2. On a bill for divorce for adultery, condonation is a conclusion of fact, if not of law, and must be proved by defendant, upon whom lies the burden of proof.

3. Evidence *held* insufficient to show condonation of a wife's adultery.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, whose opinion is reported *post p. 331.*

*Mr. Cortlandt Parker,* for the appellant.

*Mr. James R. Mulligan,* for the respondent.

The opinion of the court was delivered by

VROOM, J.

The bill in this case was filed by the husband, charging his wife with adultery committed with one David Young, Jr., at

York, in the State of Pennsylvania, on the 29th day of January, 1908, and at divers other times between January 24th and February 16th of that year at No. 55 Beaver street, in York, and at various other places in that town. The Vice-Chancellor held that the evidence established the guilt of the defendant, that the only debatable question was that of condonation, and that it had been condoned, and therefore advised the dismissal of the petition of the husband. The wife appealed from so much of the decree as adjudged her guilty of adultery, and the husband appealed from so much as decreed that he had condoned his wife's defence and directed a dismissal of his petition. We agree with the conclusion of the Vice-Chancellor as to the adultery of the wife, leaving only for consideration the condonation on the part of the husband.

Condonation, as stated by *2 Bish. Mar. & D.* § *36,* is

"where the husband comes into possession of the fact and proof that his wife has committed adultery, then if he has marital intercourse with her, the law presumes that he condones the offence and refuses him divorce."

It is well settled that condonation is a conclusion of fact and not of law and must be proved by the defendant, and the burden of proof is upon the defendant. *Graham* v. *Graham, 50 N. J. Eq.* (5 *Dick.*) 701, 706; *Goeger* v. *Goeger, 59 N. J. Eq.* (14 *Dick.*) 15, 16; *Hann* v. *Hann, 58 N. J. Eq.* (13 *Dick.*) 211; *Bornstein* v. *Bornstein* (1893), *L. R. Prob Div. 292, 302.*

The learned Vice-Chancellor bases his conclusion upon his belief that from the weight of the evidence the husband had marital intercourse with the defendant *after* he came into possession of the fact and proof, as he says, or to use the expression in *Marsh* v. *Marsh, 13 N. J. Eq.* (2 *Beas.*) 281, "reasonable knowledge."

In using the term "reasonable knowledge" in the case of *Marsh* v. *Marsh,* there can be no doubt but that Chancellor Green was considering merely legal proof, for he says, "reasonable knowledge may be said to have been when information of a fact is given by credible persons, speaking of their own knowledge, particularly if the same facts be afterwards proved and they become instrumental in the proof."

If then the evidence in this cause had shown that the petitioner had produced any facts in evidence proving the guilt of the defendant and of which he was aware before he ceased having marital relations with her, admittedly there would be ground for the position of the court below that such marital intercourse was a condonation of the guilt of the wife.

The evidence in this case established the fact that the parties were married in September, 1904. After their marriage they lived in several cities before coming to York, Pennsylvania, where the acts of adultery complained of were committed—some of these acts were committed during the absence of the complainant from his home. The complainant's business was that of a railroad accountant or auditor, and while at York was employed by a New York firm to examine the accounts of a trolley system in that city. He became acquainted there with David Young, Jr., who is named as co-respondent, who was the superintendent of said trolley system, and Young and his wife and the complainant and his wife were much together. About the 24th of January, 1908, the complainant went on business to New York and remained for about a month and a half. It was during this absence that the adultery was committed. On complainant's return to York he found lying on the bureau in his wife's room a letter from David Young, of a character certainly calculated to arouse his suspicions, and it evidently did, for he demanded an explanation of it from her; she said it was only some of Young's foolishness. She denied any guilt, he believed her and they became reconciled and lived together, and he continued marital relations with her up to about the time he left her on August 1st, 1909. He occupied the same bed with his wife until the separation and admits that earlier in the week, on up to Thursday night, he may have had sexual intercourse with her.

Eight days before he left his wife, that is, the Sunday beginning the last week in July, 1909, complainant stated that he was told by his brother Morton that David Young's wife had gone to York to obtain a legal residence there in order to sue her husband for divorce, and that she was going to name his wife as co-respondent in the case. Although complainant says he "didn't

take any stock in what Morton had to say," the next day, meeting his wife's mother, Mrs. Davis, he asked her whether he couldn't have a little talk with her. On her assenting, while walking on the street with her he told her he had been informed that his wife had been unfaithful to him for a year and a half, and that Mrs. Young had been in York maintaining a legal residence and was going to name Mrs. Greims as co-respondent. Mrs. Davis asked him whether he was crazy or not and said there is no truth in this and said she didn't see how I could believe that Jennie (the defendant) ever cared anything for Mr. Young.

On returning from the walk Mrs. Davis told the defendant what her husband had said and that evening, as the defendant testified, she talked the matter over with her husband; he replied that the little baby didn't look a terrible lot like him; that "he had been wise" and that she had been unfaithful to him for a year and a half. Then she added, "I was very nervous and excited and he harassed me and talked awhile and said everything would be all right, and that is all that was said that night."

The next day, Tuesday, the petitioner went to the office of Charles W. Mercier, an uncle of his wife. Mr. Mercier testified that the petitioner said to him, "Uncle Charlie, I am going to leave Jennie. Would you see her and have her walk quietly out." Then he (Mercier) asked what the trouble was and petitioner replied, "Jennie had been crooked for a year and a half and I have known it." The uncle says he told him if that was the case, he, the petitioner, was a fool to live with a woman that long, knowing that she was unfaithful to him, to which the petitioner replied, "Well, I thought I would give her a chance." The petitioner denies saying to Mr. Mercier that he had known his wife was unfaithful to him.

On the same day, while returning home in company with his brother he met Mrs. Young and she said to him "that she wasn't going to bring an action for divorce against her husband, that she was just back from York and was living with Dave again."

On Friday of the same week the solicitor with whom Greims had conferred met him and one Clader, who was then living

with the petitioner, and it was then that Clader told him that he was carrying notes back and forth from Mrs. Greims to Mr. Young, and that Mrs. Greims had made a confession to him about the child not being a legitimate child, and had told him that you would be willing to tell Howard (the petitioner) every-thing except that she put it to Dave and had went the limit down to York, Pennsylvania. While the petitioner testified that he didn't believe Clader's statement, he couldn't see why a woman should talk to him of those things; he did, however, determine upon a decided step; he says,

"I decided to leave Mrs. Greims and to make an investigation and to find out if what they said was true. In fact I didn't know anything about it myself and would have to go down to York to find out whether what they did tell me was true."

On Friday and Saturday he remained at the house and both nights occupied the same bed with his wife, but had no marital intercourse with her.

On Sunday, August 1st, 1909, he left the house and taking with him his daughter Marjorie did not return. On that day he sent to his wife the following letter:

"August 1st, 1909.
*Mrs. J. E. Greims,*
178 N. 17th Street,
East Orange, N. J.:*

"DEAR JENNIE—I requested my attorneys to commence legal proceedings against you to secure a divorce and you will be duly advised by them in connection therewith. In accordance with their advice I have taken Marjorie with me and will provide for her. I enclose you my check, No. 607, in the amount of $10, to cover immediate needs. I have arranged with my attorneys, Cortlandt and Wayne Parker, Room 810, Prudential Building, Newark, New Jersey, to provide you with funds for necessities pending judgment, which money you can procure from time to time by calling on said attorneys. All matters which you desire to take up with me must be done through above attorneys.
"Yours very truly,
"H. E. GREIMS."

From these facts, and they substantially include all that are essential to the determination of this cause, the Vice-Chancellor concluded that the petitioner was not entitled to a decree of divorce, for the reason that he had condoned the guilt of his

wife. Holding that he had "the right to draw such inferences as the whole evidence may warrant," he thought that Greims did have "reasonable knowledge" of his wife's guilt as early as or before Thursday, July 29th, and that he may have had sexual intercourse with her up to and including Thursday night.

The fact that the Vice-Chancellor uses the term "reasonable knowledge" as a quotation makes it certain it is from the opinion of Chancellor Green in *Marsh* v. *Marsh, supra*. This leads us to consider whether, in fact, the petitioner had on or before Thursday, July 29th, the reasonable knowledge which in *Marsh* v. *Marsh* is defined to exist "when information of a fact is given by credible persons, speaking of their own knowledge, particularly if the same facts be afterwards proved 'and they become instrumental in the proof."

You will search in vain through this record for any evidence produced at the trial of this case which was known to the petitioner when he left his wife, and it was urged, and justly so, that the petitioner had then no legal evidence whatever, unless the alleged confession to Clader was legal evidence.

That the petitioner may have had suspicions as to the guilt of his wife can readily be assumed, and in looking at the case as presented in the evidence it may seem incredible that he should have continued so long to cohabit with her. But as Bishop says,

"suspicion is not knowledge. It is not belief. Beyond which reason demands that something be conceded—in some instances a great deal—to the special confidence which married parties commonly do and always should have in each other."

It must be remembered that the petitioner had faith in his wife and gave full credit to her continued assertions of innocence, and as Vice-Chancellor Malins said in *Brown* v. *Brown, L. R. 7 Eq. 185, 193,* "husbands are apt to believe what their wives tell them."

As hereinbefore stated, the burden of proof to establish condonation was upon the defendant and this she failed to do. There is no proof whatever that the petitioner had sexual intercourse with his wife after Thursday, July 29th. The petitioner

testified that he had not, and the defendant, although a witness, did not assert that he had. That he occupied the same bed with his wife on Friday and Saturday night might, if unexplained, warrant a conclusion of forgiveness on the part of the husband, but any presumption of condonation arising therefrom may be rebutted and has been in this case.

We agree with the learned Vice-Chancellor that this case is not without difficulties, but we think most of the difficulties of the court below have arisen when, after decreeing without hesitation the guilt of the wife, it has endeavored to establish condonation and condemn the petitioner to "a life of most loathsome bondage."

The decree below, so far as it finds condonation, should be reversed.

No. 56—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE, TREACY—14.

No. 57—

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE, TREACY—14.

*For reversal*—None.