Hazel Howe Rushmore, complainant,

*v.*

Samuel Willis Rushmore, defendant.

[Decided June 23d, 1934.]

*Mr. Merritt Lane,* for the complainant.

*Mr. Francis A. Gordon,* for the defendant.

GROSMAN, A. M.

Complainant sues for separate maintenance under section 26 of our Divorce act. The defendant, by his answer, as well as by a separate petition for divorce, charges the complainant with statutory desertion and seeks a decree of divorce against her on this ground. The two actions have been consolidated.

Heretofore the complainant herein sued the defendant for separate maintenance in this court (D. 84-247). Her bill of complaint in the original suit filed on the 29th day of April, 1931, charged the defendant with extreme cruelty consisting generally of physical brutality, abusive language, violent temper, and specifically as follows: That on one occasion he assaulted her and threw her to the floor; that

when she arose, he again threw her backward, whereupon she tripped over a suitcase and suffered a miscarriage; that he then spat in her face twice; that he frequently accused her in the presence of others of being drunk; that she was a protestitute and had been the mistress of a number of men; that in the presence of strangers he would discuss intimate details of his married life; that frequently he would arouse the complainant at two or three o'clock in the morning and accuse her of improper conduct; that on one occasion the defendant told his butler the vilest and most indecent things about the complainant; that he ordered the servants to refuse to serve meals to the complainant; that he threatened to kill her; that three times in one week, while sitting at the table with the defendant, he threw glasses of icewater at her; that on an occasion in December of 1930, while they were on a boat trip to the West Indies, he accused the complainant of misconduct and became so violent and threatening in his attitude that the complainant became apprehensive for her safety and locked herself in a bathroom, whereupon the defendant began to kick the door and pounded it with his fists, breaking the panels so that the complainant was compelled to call for the help of a steward who in turn sent for the ship's doctor in an effort to quiet the defendant; that on numerous occasions the defendant assaulted her physically with murderous ferocity, in consequence of which she was compelled to leave him, which she did on the 4th day of February, 1931.

On June 2d, 1931, the defendant, through his then solicitors, Messrs. McCarter & English, of Newark, filed an answer to said bill of complaint wherein, after admitting the first three paragraphs of the bill which contain recitals of a jurisdictional nature, he categorically denied each and every remaining allegation of the bill, paragraph by paragraph. On August 8th, 1931, some three months after the filing of the bill of complaint and two months after the filing of the original answer, the defendant, through his solicitors, filed an amended answer wherein for the first time he charges that on the 15th day of February, 1931, the complainant condoned

the supposed acts of cruelty charged against him. No explanation appears for the omission of this defense from the original answer. Its significance must have been apparent to the defendant and certainly to his solicitor. Seemingly, it was but an afterthought.

The case was tried before Vice-Chancellor Church for seven days. Before deciding it he resigned and the voluminous transcript was turned over to Advisory Master Hugh B. Reed, who, merely from a reading of the record and transcript, held that in his opinion the complainant was not entitled to a decree because on the 15th of February, 1931, as charged by the defendant, she had condoned any act of cruelty which had preceded that date. I consider it most unfortunate that the advisory master who decided this case in the first instance did not have the benefit of observing the parties in person during their recitals. It may well be that his conclusions would have been otherwise. A decree was subsequently entered on the 1st day of November, 1932, directing the defendant to pay to the complainant $391.92, the costs of depositions *de bene esse* taken in Tacoma, Washington, $100 for an expert handwriting witness and a counsel fee of $3,000, and dismissing the complainant's bill. From this decree an appeal was taken to the court of errors and appeals, which resulted in an affirmance on the 27th day of September, 1933.

On April 2d, 1933, while the appeal from the original decree was pending in our court of errors and appeals, the complainant called the defendant on the telephone at his home, this day being his birthday. Her purpose, as testified to, was to seek a reconciliation. The defendant, however, upon ascertaining her identity refused to talk to her. On November 8th, 1933, the complainant having consulted with Mr. Merritt Lane, her counsel, definitely determined to return to her husband, and on that date wrote him a conciliatory letter (*Exhibit C-2*) to the following effect:

"My dear Sam—It has been such a long time since we have seen each other and I am wondering how you feel toward me. I, for one, am older, wiser, and sadder. We have gone thru such a lot

of horrible publicity and litigation for I left you thinking that I was justified in doing so and in remaining away. I am anxious to try it again. Don't you think we could make a go of it this time? I shall try very hard but you should, I think, promise not to let your temper get the better of you.

Won't you let me hear from you if you are willing that I should return?

Sincerely

HAZEL."

To this she received no response and on the 14th of November, 1933, the complainant again wrote to the defendant (*Exhibit C-3*), offering to return and make an effort to rehabilitate herself as the defendant's wife. To this communication he likewise failed to answer.

On December 4th, 1933, the complainant's solicitor wrote to the defendant's solicitor, Mr. George W. C. McCarter (*Exhibit C-4*), advising him of the complainant's efforts to communicate with her husband in an effort to have him take her back, and laying the entire situation before him with a request apparently for enlightenment as to the defendant's attitude in the matter. On December 7th, 1933, Mr. Lane received a letter (*Exhibit C-5*) from Mr. McCarter in answer to his communication wherein it is stated that he had talked to Mr. Rushmore who had shown him the two letters which the complainant had written him. He thereupon proceeds to one-sidedly review the case and ends his letter with these words:

"Under all these circumstances, Mr. Rushmore is unwilling to take her back. For him to accept her cold proposition would require a degree of self-abnegation by Mr. Rushmore, called for neither by the law of nature nor the law of the land."

This letter was followed by another letter from Mr. Lane to Mr. McCarter (*Exhibit C-6*) which reiterates the complainant's willingness to return. This exchange of correspondence was concluded by a final letter from Mr. McCarter to Mr. Lane, dated December 12th, 1933 (*Exhibit C-7*), the significant portion of which reads as follows:

"Suffice it to say that on Mr. Rushmore's part I have nothing further to add."

Thereupon on January 2d, 1934, the complainant filed her present bill for separate maintenance. The defendant by his answer sets up proceedings in the previous suit and then by a separate petition, which will be treated as a counter-claim, seeks a decree of divorce from the complainant on the ground of desertion, his claim being that the pendency of the original suit did not stay the running of the desertion period because it was not brought in good faith.

Upon the trial of the instant case, the complainant offered to return to the defendant unconditionally, even going to the length of asserting her willingness to respect the defendant's wishes with regard to the company which she kept and to which he had objected. The defendant refused to take her back, stating that he believed her testimony to be perjury pure and simple. At page 99 of the transcript he states in detail his reasons for his unalterable determination not to resume cohabitation with the complainant, none of which are valid in law.

I shall deal with the defendant's counter-claim first because my position thereon will be dispositive of the case. He seeks a decree on the ground of desertion, charging that the defendant deserted him in the month of February, 1931, ever since which time and for more than two years last past, the defendant has willfully, continuedly and obstinately deserted the counter-claimant. If true, his cause of action would have ripened in February, 1933. However, the complainant filed her bill for separate maintenance in this cause on April 29th, 1931. The decree dismissing her bill was entered November 1st, 1932, and her appeal therefrom was decided by our court of errors and appeals on September 27th, 1933. The appeal, of course, was but a step in the cause. If, therefore, the original suit was brought in good faith, the complainant's desertion has not been of two years' duration and the counter-claim must fail. The general rule is that in a suit for divorce for desertion, none of the time occupied by the pendency of a former *bona fide* proceeding for divorce by one of the parties against the other can be computed as part of the time of the desertion in the later case.

*Barbour* v. *Barbour, 94 N. J. Eq. 7; 118 Atl. Rep. 778; McKee* v. *MeKee, 107 N. J. Eq. 1; 151 Atl. Rep. 620.* I incline to the view that this rule is equally applicable where the previous proceedings were for the purpose of obtaining a decree of separate maintenance on the ground of extreme cruelty. However, if the previous suit was not brought in good faith, its pendency would not operate to stay the running of the desertion period. The defendant and counter-claimant contends that the complainant's previous suit was not brought in good faith; that therefore it comes within the exception to the general rule and that her desertion must be computed as having commenced in February, 1931, without regard to the time during which the previous suit between the parties was pending, namely the period from April 9th, 1931, to September 29th, 1933. This of necessity leads us to an examination of the facts in the original suit for the purpose of determining the *bona fideness* of the complainant's previous action.

I have permitted the introduction of not only the technical record in the first case but also of all the pleadings and testimony taken therein. *Weigel* v. *Weigel, 63 N. J. Eq. 677; 52 Atl. Rep. 1123; Locher* v. *Locher, 112 N. J. Eq. 25; 163 Atl. Rep. 251.* Of necessity I have read and considered the testimony in the previous suit in order to determine the question of good faith. Perhaps as clear an exposition as any to be found, on the question presented here, is that of Vice-Chancellor Grey in the case of *Weigel* v. *Weigel, supra,* viz.:

"The general proposition appears to be indisputable that the separation of one spouse from the other during the pendency between them of a suit for divorce is justifiable, and is therefore not an obstinate desertion during that period. If the previously pending suit were for divorce on the ground of adultery, cohabitation would ordinarily condone the offense and deprive the complainant of her remedy. The same principle applies if the divorce sought is a limited one from bed and board on the ground of extreme cruelty. For if the wife, who is in such cases usually the complainant, continues to live with her husband pending such a suit, she throws

doubt upon the extremity of the cruelty of which she alleges she is the victim. Ordinarily cohabitation is proof that the treatment of the wife by the husband is not cruel, and is usually of itself a contradiction of that which the wife must in such cases establish, namely, a condition of such extreme discomfort and wretchedness as incapacitates her to discharge the duties of a wife, or seriously endangers her health. But in all the cases which state the proposition in general terms there is an assumption that the case which relieves from the duty of cohabitation during its pendency is one brought in good faith, in order to submit to the consideration of a court a condition of facts which the complainant really believes entitles her to the relief sought. In such a case it is of no significance whether the complainant succeeds or fails in the suit by which she presents her claim. Her separation during its pendency is not obstinate, for the reason that there is a justifiable cause for it, and that it is her right to have a judicial determination of what she believes to be real grievance, unembarrassed by presumptions adverse to her which would necessarily attend upon continued cohabitation with her husband. When, however, it is shown that the wife's previous suit, the pendency of which is set up to excuse her apparent desertion, was based on allegations which were known by her to be false when they were submitted to the court, and when her testimony in that suit in support of those allegations is proven to have been untrue by many disinterested witnesses, so that it is made quite clear that her previous suit was a false pretense, and not a genuine presentation of a believed grievance, the excusatory effect of the pendency of the previous suit is wholly lost. Such an exhibition shows that the proceeding was a fraud upon the court, on the law, and on the defendant attacked by it. Its pendency is no answer to proof that the wife willfully, continuedly, and obstinately abandoned her husband. Indeed, it may be additional evidence of the obstinacy of her determination to desert her husband and escape from her marital duty. This exception to the above-stated rule is recognized in all the cases which consider this phase of the question.

Chancellor McGill, in *Drayton* v. *Drayton, 54 N. J. Eq. 302; 38 Atl. Rep. 25,* refers to the element of good faith, as necessary to prevent the time consumed by such a suit from being computed as part of the statutory period of desertion. In *Porritt* v. *Porritt, 18 Mich. 420,* the question of the good faith of the previous suit is discussed as an essential matter to its effective use as a defense. Mr. Bishop designates such a sham proceeding as a fraud and a pretense which will not justify the desertion. *Bish. Mar., Div. & Sep. No. 1758.* See, also, *1 Nels. Mar., Div. & Sep. 146."*

It follows therefore that in order to conclude that the complainant's initial suit was not brought in good faith, it must in fact have been "a sham and a pretense;" that the charges levelled against the defendant in that proceeding were merely a figment of the complainant's imagination, incapable of proof to her knowledge and advanced by her maliciously for the purpose of publicly embarrassing and humiliating the defendant. Such is not the fact. .

This court in disposing of the original proceedings found that the defendant was guilty as charged of the extreme cruelty attributed to him but that the complainant had condoned his offense. The judgment of this court against the defendant was "guilty but forgiven." This is a far different proposition from a finding of not guilty because the accusation was false.

The defendant contends, however, that the mere fact that the complainant denied the condonation which fact was found against her, is sufficient to establish her "bad faith" in prosecuting her original suit. The argument is advanced that "she is presumed to know the law" and that she should have known that upon the facts as ultimately found, she was not entitled to a decree and consequently to maintain her suit. I have been unable to find authority, nor has any been submitted to me by the able counsel for the defendant, in support of so radical a view. If it can be seriously urged that because all persons are presumed to know the law, the complainant must be charged with having known in advance that her case would fail because the fact of condonation would

be found against her, it would necessarily follow that all lost causes must be held to have been brought in bad faith. This, of course, is not the rule.

In *Weigel* v. *Weigel, supra,* it is held that:

"Where the suit is brought in good faith, in order to submit to the consideration of a court a condition of facts which the complainant really believes entitled her to the relief sought, it is of no significance whether the complainant succeeds or fails in the suit by which she presents her claim."

Even if the defendant could successfully invoke against the complainant the presumption that "all persons are presumed to know the law," it could not avail him in the instant case because condonation is a question of fact and not of law (*Greims* v. *Greims, 80 N. J. Eq. 233* (at *p. 234*); *83 Atl. Rep. 1001*), and the rule in its broadest sense can only be said to charge a person with a knowledge of the law and certainly not with knowledge of the court's probable conclusions upon disputed facts.

The complainant has consistently throughout the previous trial, and also in the instant suit, denied that on the 15th and 16th of February, 1931, she condoned the defendant's offense in the sense that she freely and wholeheartedly forgave him for his transgressions and sealed her forgiveness by submitting to sexual intercourse. The trial court found the fact against her, undoubtedly basing his conclusions on the testimony of the defendant, his butler, Herman Fransson, and partly upon the complainant's own testimony. The facts surrounding the alleged condonation are as follows:

The complainant left the defendant on the 4th of February, 1931, because, as she states, his cruelty toward her was unbearable and she could endure it no longer. Undoubtedly she left in haste because she failed to take with her certain of her personal papers which she thought important. Mistakenly she believed the butler Fransson to be sympathetic to her and appealed to him to bring these papers. if not directly to her, to one Rev. John Meyer, who maintained a music shop in the town of Plainfield. The butler agreed, or at least told her that he would bring the papers

to the music shop. Perfidiously, however, he betrayed her to his employer, the defendant, who thereupon evolved a scheme to entrap the complainant at the moment that she called for her papers, it being his thought that she would offer or that the butler would exact from her some monetary reward for the service, and that this would constitute an act of bribery and subject the complainant to arrest and criminal prosecution. The butler readily fell in with this scheme. A meeting was arranged for by him with the complainant at the Rev. Meyer's place. Arrangements were made that a member of the Plainfield police department was to secrete himself on the premises, observe the proceedings and thereupon arrest the complainant. Subsequently the chief of police refused to be a party to the transaction whereupon the defendant engaged the services of a private detective. Unfortunately for the success of this plan, someone phoned the complainant before the appointed time and warned her not to attend. To whom she is indebted for this service is not apparent. She did not keep the appointment.

The defendant in his testimony vigorously contends that he did not wish to bring about the complainant's arrest. If he did not, I fail to see the purpose of these elaborate preparations for his wife's entrapment. I am convinced that he fully intended to bring about the natural result of his scheme, namely, her entrapment and arrest upon the charge of bribery of his butler. I dwell at length upon this incident because of the light which it throws upon the attitude and purpose of the persons upon whose testimony the fact of condonation was established.

Nothing more transpired between the parties until about the 14th of February, 1931. In the meantime the defendant developed what his doctor believed to be a gangrenous diabetic ulcer on his leg. He was ordered to bed and there remained with his limb bandaged from the ankle to the knee. He then instructed his physician to phone the complainant at the New York hotel where she was stopping with her mother and request her to come and see him. She did so on the afternoon of February 15th, 1931. From what the doctor

had told her over the phone, she believed that the defendant was suffering from a serious illness. Upon entering the room, undoubtedly moved by the defendant's stricken condition and her natural womanly sympathy, she kissed him. She spent sometime with him and then signified her intention of leaving and returning to New York. He protested vigorously against her so doing but she nevertheless persisted and left the house. He followed her to the door and shouted unpleasant accusations against her. She could, of course, have continued on her way and disregarded the defendant. Moved, however, by his wrought up condition, and undoubtedly sorry for him because of the serious illness from which she believed him to be suffering, she returned to the house, as she states, intending to leave at a later time when she could do so without so greatly upsetting the defendant. Perhaps she should not have returned but she did. Whether her motives were those of pity for the defendant because of his physical condition, as she states, or otherwise, is of no particular moment. Her presence in the same house with the defendant is not condonation. *Taber* v. *Taber, 66 Atl. Rep. 1082* (at *p. 1084*—not reported). Whether or not the complainant did actually condone the defendant's previous conduct depends entirely upon what transpired between the time when she returned to the house on February 15th, 1931, and the morning of February 16th, 1931. It is undisputed that the weather was inclement; that the complainant's hat and coat were secreted from her and she states that for hours she sought to locate her outer wearing apparel so that she might leave but without success. She also admits that in the late hours of the night or in the early hours of the morning, fully clothed, she threw herself upon the defendant's bed and fell asleep for several hours. The defendant, however, contends that she fully undressed, put on a pair of his pajamas, got into bed with him and submitted to sexual intercourse. This she denies vehemently. The only other testimony on this point is that of the butler, Fransson, who testified that he came to the room occupied by the parties on the night of the 15th for the purpose of giving the defendant

a drink of orange juice; that when he entered, the defendant was in bed; that the complainant, fully dressed, was also lying on the bed alongside of the defendant who had his arm about her and then he proceeds to testify to what I consider to be most significant. He amplifies his testimony by stating that in his presence the defendant proceeded to pat the complainant "over the part where the stomach is" apparently with an amorous or affectionate gesture. Continuing he states further: "I excused myself for interrupting, but he [Rushmore] said, "it is all right, Herman, everything is all right," so I went out again." I cannot believe that this defendant, who unquestionably is a man of culture, would treat his wife so intimately in the presence of his servant. Moreover, I cannot eradicate from my mind the admitted fact that this butler who testified so glibly to these acts of marital intimacy between the parties, is the same man who, while leading the complainant to believe him sympathetic to her cause, and agreeable to aiding her in recovering her personal papers, as has been indicated, actually conspired only a few days before this incident with the defendant to bring about her entrapment and arrest. His moral responsibility as indicated by his conduct leads me to conclude that it would be highly dangerous to predicate any conclusion upon his testimony and that it should be disregarded.

Much, however, is made of the fact that the complainant admitted that she was in the defendant's bed sometime between February 15th and 16th. This of itself is not sufficient to establish condonation. *Hann v. Hann, 58 N. J. Eq. 211; 42 Atl. Rep. 564.* Even if it were definitely established that sexual intercourse had taken place between the parties, on the night of February 15th or 16th, this fact standing alone would not be sufficient to establish condonation. If this were so, an offending husband might by force of arms exact this marital right from a wife whom he had most grievously offended and then plead condonation. Sexual intercourse is not condonation; it is merely presumptive evidence of a forgiveness which the law terms condonation and like all presumptions may be rebutted. What is meant in law by the term

condonation is clearly expressed by Vice-Chancellor Stevens in the case of *Taber* v. *Taber, supra,* wherein he states:

"These expositions of the meaning of condonation show clearly that it is something more than forgiveness, in the sense of ceasing to harbor resentment. It is not only a blotting out of the offense from the mind and heart of the person forgiving, but a restoration of the offender to his former position."

A careful examination of the circumstances surrounding the alleged condonation leaves me wholly unconvinced thereof because the conduct of the defendant was in nowise conducive to forgiveness. It must be borne in mind that he stands guilty of extreme cruelty. As stated by Vice-Chancellor Bergen, in the case of *Totten* v. *Totten, 60 Atl. Rep. 1095* (not reported), "condonation is based on repentance * * *." Nowhere in the testimony do we find a single word uttered by the defendant to indicate repentance for the cruelty which he had visited on the complainant. Why then should this aggrieved spouse have taken it upon herself to grant a forgiveness which was never asked for? She had been maltreated physically on numerous occasions; she had been publicly accused of being a "golddigger;" her chastity and sobriety had been impugned before her friends and servants; she knew that only a few days prior to the 15th of February, 1931, her husband, with the aid of his butler, had sought to entrap and bring about her arrest and yet it is urged that without the slightest evidence on the part of the defendant indicating compunction for his past conduct and a promise to treat her with conjugal kindness in the future, she without more ado condoned his offenses. It taxes credulity, particularly so in view of the temperament of the parties as I have observed it.

Furthermore, the mere allowance by this court in its final decree of a counsel fee of $3,000 to the complainant's solicitor as well as suit moneys, militates against the contention that the first suit was brought in bad faith. Ordinarily counsel fees by way of costs are allowed to the prevailing party. On occasion such are allowed to a defeated litigant but only

where the court feels that the action was brought in good faith. It would be anomalous to say the least if this court felt that a suit was brought in bad faith to allow costs and substantial counsel fees for the bringing thereof. Nor can I believe that our court of errors and appeals ordered the defendant to pay for the printing of the record in the first case, thoroughly considered it and nevertheless failed to denounce the bad faith of the complainant in bringing the action if such were the fact. Certainly this court, which tried the case for seven days, and our court of errors and appeals, which considered the matter at length, would have discerned the complainant's bad faith in bringing the original suit and so stated the fact to be, if such were the case.

I am satisfied that the original action was not brought in bad faith and that the time consumed during its pendency cannot be computed as part of the period of desertion.

Even if this were not so, the defendant cannot prevail upon his counter-claim. The law requires that a husband who has been deserted by his wife must make the efforts of a just man to terminate the desertion and that these efforts must be continued by him during the entire period of desertion unless it be manifest that his efforts would be useless or that the wife is unchaste. *Goldberg* v. *Goldberg, 101 N. J. Eq. 284; 137 Atl. Rep. 438.* This is the rule where the husband's conduct did not in any way contribute to the desertion. Where, however, the desertion may in the first instance be attributable to his acts, he is in duty bound to exercise greater efforts to obtain his wife's forgiveness and return. *Van Wart* v. *Van Wart, 57 N. J. Eq. 598; 41 Atl. Rep. 965.*

In the case at bar there is no question but what the defendant by his unreasonable conduct, amounting to extreme cruelty, is responsible for the separation. He contends that during the pendency of the litigation he wrote to his wife repeatedly and asked her to return. The fact of the matter is that while he did write a number of letters to her which apparently indicated a desire on his part to have her return, he also during this period sent her cartoons and clippings from newspapers of such nature as to have a diametrically

opposite effect upon the mind of any intelligent woman to that which he testifies he sought to create. A cartoon, a reproduction of which will be found in the original transcript, is entitled "gold-diggers" and depicts generally an aged man with a moneybag in his hand being waylaid and entrapped by a female adventuress aided by her attorneys and detectives. A clipping which he sent her refers to the probable feelings of the husband of Ruth Snyder, a notorious murderess, at the time when he awoke and found his own wife in the act of taking his life. It is incomprehensible how the defendant thought to win his way back into the affections of his aggrieved spouse through the media of such communications. The mere writing of letters to an estranged spouse seeking her return is not sufficient to satisfy the duty imposed upon a husband to make reasonable efforts to terminate a desertion. *Smith* v. *Smith, 55 N. J. Eq. 222* (at *p. 228*); *37 Atl. Rep. 49.* I am of the opinion that the defendant did not make a *bona fide* effort to terminate his wife's desertion and if there were no other elements in the case, for this reason alone, his counter-claim would have to be dismissed.

We now come to the last issue in the case and that is whether or not the complainant was privileged in law to return to the defendant and resume her position as his wife, and whether she has made a *bona fide* effort to do so. In *Stover* v. *Stover, 94 N. J. Eq. 703; 120 Atl. Rep. 788;* it was held that where after a wife's suit for separate maintenance had been dismissed, her offer to return was repulsed, the husband's petition for divorce would be dismissed, and also that the husband was not privileged to impose any conditions upon his wife for her return.

In *Loux* v. *Loux, 57 N. J. Eq. 561; 41 Atl. Rep. 358,* the wife had deserted without sufficient cause but offered to return within the two-year period. It was held that it was the husband's duty to receive her as his wife.

Throughout the trial of the instant case the statement was repeatedly made with a sense of injury, that the complainant-wife at no time publicly apologized for her conduct in having

instituted her suit against the defendant with its attendant publicity. I know of nothing in the law which casts this duty upon her. Apparently the defendant was of the opinion that the complainant should have covered herself with sackcloth and ashes, grovelled at his feet and begged his forgiveness and in some similar manner indicated remorse for her conduct, publicly. She was not called upon to do any such thing. He prevailed in the previous suit not because of his lack of guilt of the charges levelled against him but because the trial court felt that he had made out the defense of condonation. She lost because of her alleged forgiveness. He was the one to apologize and humble himself, not she. All that the law requires of a wife in these circumstances is an honest, unconditional offer to return to her husband which may be made in a manner consistent with her womanly dignity. I think that she has fulfilled her obligation under the law in this regard. The complainant wrote the defendant twice in a conciliatory tone offering to return to him. Twice she phoned him but in each instance she was rebuffed. Her solicitor on three occasions wrote the defendant's counsel in an effort to bring about a reconciliation between the parties, all without avail. Not only did the defendant fail to offer any encouragement to the complainant but he bluntly repulsed her. At the trial she again repeated under oath her willingness to return to her husband unconditionally and even went beyond the call of duty and offered to be guided in her associations and conduct by the defendant's wishes. The defendant, on the other hand, twice during the proceedings emphatically declared his unwillingness to resume marital relations with the complainant claiming that she was a liar and a perjurer and that she had married him only for his money.

Even if these charges be true, they are no defense in law. Nothing short of the complainant's guilt of a matrimonial offense will suffice to excuse the defendant from supporting and maintaining her according to their station in life. It may be that it was folly for this man to have married this lady in the first instance. The things which motivate men

and women in entering into matrimony are only too often beyond comprehension. This, however, is a matter with which we have no concern. He should have realized the limitations which his years placed upon him. At the time of the marriage he was sixty and she forty—old enough to be her father. Their views of life were as divergent as the poles. She wanted life and love, laughter and the society of gay companions. He was interested in "steam cooling," the construction of buildings and engineering inventions. It was a marriage of convenience pure and simple on the part of both. If she married him for his money, as he charges, he married her because he desired the society and companionship of a young and attractive woman. It may be that the defendant has become so embittered by the litigation which has taken place between him and the complainant that he finds the thought of becoming reconciled to her totally abhorrent. This, of course, is an unfortunate condition from which we can offer him no relief. Like countless others he must suffer for his indiscretion in having married a woman of a younger generation, whose views, habits and general outlook upon life are not and, in the very nature of things, cannot be his.

I will advise a decree dismissing the counter-claim and awarding the complainant a decree of separate maintenance. If the parties can agree upon an allowance, well and good. If not, let the matter be presented to me according to the usual practice.