**Albert POBST (Plaintiff), Respondent,**

**v.**

**Mary POBST (Defendant), Appellant.**

**No. 30082.**

St. Louis Court of Appeals.
Missouri.

Nov. 5, 1958.

George A. Murray, Cape Girardeau, for appellant.

Spradling & Bradshaw, Cape Girardeau, for respondent.

ANDERSON, Judge.

This is a divorce suit brought by Albert Pobst against Mary Pobst. A decree in favor of plaintiff was entered below, and defendant has appealed.

The grounds for divorce alleged in the petition were general indignities, and the particular indignities relied upon were: refusal of defendant to speak to plaintiff except when enraged; keeping dogs and cats inside the house; threatening plaintiff's life with a butcher knife; and threatening to scald plaintiff with boiling water. The answer of defendant was a general denial.

The parties were married July 2, 1954. At that time plaintiff was seventy years of age, and defendant was sixty-six. Both parties had been married before. Plaintiff had four children by a former marriage, and two stepchildren. Defendant had six children by a former marriage. During their married life the parties lived in Dutchtown, Missouri, in a house owned by plaintiff, the purchase price of which was $1,200. The house contained five rooms. Plaintiff was not regularly employed, but received $38 per month from the state as old age assistance. Defendant received $66.30 per month social security.

Plaintiff testified that he and his wife began having trouble about four months after their marriage when she insisted he sell the house and move to St. Louis. Plaintiff did not want to do that. Later, defendant wanted plaintiff to sell the house and move to Cape Girardeau, and when he refused she began nagging him and "threatened to tear planks off of the house and fill the kitchen full of tin cans, anything to aggravate me and start trouble." Defendant's version of this affair was that she

wanted her husband to sell the house and move to either St. Louis or Cape Girardeau, "because I could have went back to my job, he said he wasn't able to work and I told him if he would go up there and do the cooking I'd go back to work and he wouldn't have to work." Prior to her marriage defendant worked as a curtain operator at the Superior Laundry in St. Louis, and she quit that job to marry the plaintiff.

Plaintiff further testified that he and his wife had trouble over a dog the wife owned, and stated the dog was mean and had bitten two women. Defendant kept the dog tied, but one night it got loose and defendant accused plaintiff of turning it loose. Plaintiff denied doing this and defendant called him a "damn liar", and threatened him with a butcher knife, and to scald him with hot water. Plaintiff testified defendant said: "I'll cut you all to pieces," to which plaintiff replied: "Damn you, don't you ever throw it, if you would I would be hard on you." Plaintiff further testified: "Q. And, in fact, you never did answer her back even when she was quarreling at you, did you? A. Well, sometimes we fussed a little, you know. I couldn't take it. I generally got up and walked out. I never hung around the house any more than I just had to. I didn't want to have any trouble with her."

When asked if she threatened to cut plaintiff with a butcher knife, defendant replied: "No, I shook the butcher knife at him. I was washing dishes and he was setting in by the heating stove * * * and he was calling me a son-of-a-bitch and was cussing and calling everybody a son-of-a-bitch, said he wouldn't take a lick off no damn woman, and I just shook the butcher knife at him, I just said, 'Don't never try it on me.' Now, that's all I told him. I never threatened him." Defendant denied that she threatened to pour boiling water on plaintiff. She testified: "No, I didn't. I was talking to my daughter. My grandson was kinda mean to his wife and I told her, I said, 'Before any man would hit me, if I didn't have nothing to hit him

with I'd pour boiling water on him.' I didn't say I'd pour scalding water on him. * * * It's a lie. I'll face him right in it. He knows I did not say it. I said I'd scald any man that tried to hit me and I still say it. I wouldn't take a lick off of no man. I might take one, but I wouldn't take the second. * * * He never touched me during the whole time we were married. He never tried to hit me, because I wouldn't take it."

On one occasion defendant asked plaintiff to buy her a new broom and mop. Plaintiff testified he could not do this because he had no money. Angered at this, defendant threw plaintiff's spittoon out into the yard. Plaintiff went out onto the porch to look for the spittoon but could not find it, and later found it in the yard. Defendant told plaintiff not to get the spittoon or bring it into the house. It was raining at the time and plaintiff got wet and cold. Plaintiff built a fire in the stove and afterwards defendant poured water on the fire and put it out. Defendant testified: "Q. Now, did you get mad and throw his spittoon out in the yard? A. Yes, I did because he wouldn't buy me no mop and told me not to mop and sweep and I did, a six quart stew pan and he had it full of ashes level to the top and he would spit in there and throwed his old tobacco in there and he taken the paint off of all my linoleum and he spit on the chair 'rounds and every time I would mop, the next day the floor would be all brown where he spit over the pan, and I throwed it out. * * * Q. And did he ever build a fire in the house and you poured water on it and put it out? A. Yes, that's the Sunday that he went in and scattered ashes all over my kitchen, after I had mopped and swept with the old broom and mop I had, he spread ashes over there, he got the ash pan out, he was mad and he come on in the front room where I had mopped my front room and he jerked the ash pan out there and he scattered ashes all over the floor and I kicked the ash pan out of his hand. That's when he raised up and cussed me and called me a

bad name and said he ought to blow my brains out with a shotgun and I throwed the pan outside and I commanded him not to bring it back." Asked why she threw water on the fire, defendant replied: "Because I was mad because he wouldn't get me a broom and a mop, and he told me not to mop or sweep."

Plaintiff denied that the ashes in the can he used for a spittoon ever spilled out or got the place dirty. He testified he "never missed the pan." He stated: "I used tobacco all my life. She knowed that I was using tobacco before I married her. My daughter came there one day and she said: 'Pop, you are still chewing your tobacco.' I said, 'Yeah.' And she got up and told her, she said, 'If it's his pleasure to chew, let him chew.' That's what she told my daughter."

Plaintiff testified: "I didn't like the idea of the dogs and cats in the house all the time, I didn't like that, that dog was scratching all the time, it's a big dog. One time they thought he got the mange and her son brought a gallon of motor oil to grease him up with. The dog was in the house pretty near all the time and is yet—a dog with mange."

Defendant owned two cats, a Persian and an "alley cat." The Persian cat would sharpen its claws by scratching the wallpaper in one of the rooms of the house. This room, according to plaintiff's testimony, was newly papered about a year prior to the time the parties were married. The cat "scratched plumb through the wall to the wood." Plaintiff stated: "I never did say anything, I didn't think it would be any use if I would, I would just cause trouble and I didn't want to do that, I just let them go."

Mrs. Ora Stovall, a neighbor, testified: "Well, the cats did scratch the paper on the walls, just like Mr. Pobst said they did." The witness stated that the scratches were as high as her head on different places on the wall; that the cats got up on the furni-

ture and then reached up with their claws and scratched the wallpaper "plumb to the wood." Like testimony was given by three other neighbors.

Defendant testified that the wallpaper in the room where the cat scratched was all greasy and dirty and, "I figured if the cat scratched it up he would paper it." She stated that the cat scratched all the way to the wood. It was the Persian cat that did the scratching, and "kept getting higher and higher on the wallpaper." Asked if her husband complained about this, defendant replied: "Oh, once in a while he would bring out a cuss word and say 'That damn old cat is scratching up the paper.'"

Plaintiff testified that defendant bought a new television set which she installed in the room that the "cats scratched up." Defendant told plaintiff to keep his hands off the television set, but he was given permission to listen to it whenever it was turned on by defendant. This plaintiff never did. Defendant's version was as follows: "I'll tell you what I got mad about. I had a honeysuckle ready to bloom that I brought from Houston, Texas. He was mad and he went out and cut everyone of them down on the fence. I said, 'All right, if you cut my honeysuckles down, don't look at my television.' That's all I said to him and from then on, he was so bully that he wouldn't never come in and look at it."

Plaintiff and defendant attended St. Edwards Catholic Church in Dutchtown. Sometime after their marriage defendant told plaintiff not to sit in the same pew with her, but never told plaintiff the reason for this. Plaintiff obeyed this request.

About a year before the trial defendant quit speaking to plaintiff, except "sometimes to start a fuss." Defendant would not eat at the table with plaintiff. Plaintiff testified: "She would walk around slapping her hands and singing, you know, while I was sitting at the table, she wouldn't sit down at the table and eat with me." This had gone on for about a year and a half prior to the hearing below. Defend-

ant would communicate with plaintiff by writing him notes which she would place under his plate. Defendant testified: "I quit talking to him because he told me he did not want me to speak to him. * * * That was, I guess, about a year ago. * * he just got mad because I wouldn't help fix that old house up, he got mad, said he didn't want me to talk to him. * * * He wanted me to give him $15.00 or $20.00 a month out of my Social Security and he wanted to put plasterboard on the house and wanted to make new porches. * * * Q. Now, then, when he told you he didn't want you to talk to him did you write him these notes telling him what you wanted? A. That's right. That was the only way I had. If I talked to him he would stand and look at me like a dummy, so I had to write notes, he wouldn't answer me. * * * We talked until about a year ago and he got mad, I told him, I says, 'Albert, let's forget everything and get along, let's forget everything and start over again.' He said, 'No, I don't want anything to do with you. I don't want you to even speak to me.' Well, I'm just as bull headed as he is, I wouldn't speak either."

Plaintiff denied ever telling his wife he didn't want her to speak to him. Defendant admitted she would not eat with plaintiff because "I just didn't want to, he wouldn't talk to me, I didn't want to eat with him." This continued after the divorce suit was filed. Defendant testified: "Q. You didn't forgive him after he filed this divorce suit? A. No, I didn't. Q. You treated him after the divorce petition was filed just like you had before? A. I just didn't say anything to him at all, he stayed out all the time."

Mrs. Ora Stoval, a neighbor, testified on behalf of plaintiff that on one occasion defendant stated that if plaintiff ever got sick she would not take care of him. Defendant admitted making this statement, and testified: "Yeah, I told her that. I told her I wouldn't take care of him because he treated me so dirty, and I didn't figure I should." Mrs. Stoval further testified de-

fendant said that when she got through with plaintiff she wouldn't leave him a spoon to eat soup with. When asked if she made such statement, defendant replied: "Yeah, I told her that, that's true." Defendant said the statement was made by her before the divorce suit was filed. Defendant also admitted telling Mrs. Stoval that if she moved she would take everything in the house, "because he didn't have anything in there when I came there. What's in there belongs to me. I moved it from St. Louis. He's got an old bed and an old table and a couple of old chairs, got one old rocking chair and that's all he had when I came down there. Everything came from St. Louis." Mrs. Stoval further testified that defendant told her on another occasion plaintiff had misplaced a water bucket with which defendant watered her geese, and that defendant told plaintiff if he opened his mouth she would get a gun and shoot him. Defendant denied making this statement.

Mrs. Harry Obermann testified that about a year after plaintiff and defendant were married she had a conversation with Mrs. Pobst. In this conversation defendant stated that if plaintiff ever got sick she would not take care of him, and if he died she would not do anything toward burying him, but that his children or somebody else would have to bury him. Mrs. Obermann stated that defendant said: "They'll just have to drag him off, I guess." Defendant denied making the latter statement, but admitted she told Mrs. Obermann that she would not take care of plaintiff if he got sick or bury him if he should die. Defendant testified: "I wouldn't have nothing to bury him with because he has not got a penny of insurance, so I couldn't have got no help. * * * I said, 'I wouldn't take care of him, the way he treated me I don't feel I should.' "

Defendant testified that the house in which they lived belonged to plaintiff and was an old run down shack ready to blow over. Shortly after the parties were married plaintiff requested defendant to give

him $15 or $20 a month out of her social security to use, with a like amount to be contributed by him, in repairing and fixing up the house. Defendant refused to do this unless plaintiff would "make the house over" to her. Defendant stated that if plaintiff would do this she would "make my insurance and furniture over to him." Plaintiff refused to give defendant the house, stating as his reason the fact that she would have a dower interest in it as long as she lived. Defendant then refused to help him fix up the house. Instead, defendant took out a $1,200 policy with the John Hancock Mutual Life Insurance Company. The premiums on this policy amount to $14.66. In addition, she pays $12 per month on a policy with the Metropolitan Life Insurance Company, and $16.20 every three months for Blue Cross insurance. All her life insurance is made payable to her son Clarence as beneficiary. Defendant spends 27 cents a day on dog food. This amounts to about $98.55 a year. Defendant testified: "Well, its my money. Don't you think I have a right to do whatever I want to with it. * * * I'd rather feed my dogs than eat myself, they ain't got nobody to look after them and they got to have a friend. I would do without myself and feed my dogs. Q. Well, you would rather feed your dogs than feed Albert? A. Yes, sir, I sure would."

When asked if she loved her husband, defendant replied: "Why should I. He never would half feed me. I would have to buy what I wanted to eat. He'd never buy anything to make a pie with, he'd never buy anything to fix in the kitchen, if I wanted anything extra I'd have to buy it. I got, Judge, about three or four or five hundred dollars' worth of bills there at home, I could have brought them, I never thought about it. Q. He bought all the staples though, didn't he, lard and flour and coffee? A. No. My children, some of them, bought that, they would come down and they would leave me enough to last me a week and sometimes two weeks, they would go and buy buckets of lard for me,

and butter, I never had no butter unless one of them bought it." At another point in her testimony defendant testified concerning the purchase of groceries: "He bought a good many, but I bought some too. If I had anything extra to eat I had to buy it." Although not regularly employed, plaintiff, according to the testimony of defendant, "still works once in a while."

This suit was filed August 7, 1957. On September 10, 1957, plaintiff left home and took up residence elsewhere. Up until that time there was no difference in the manner in which these parties lived. Plaintiff bought the groceries and defendant kept house. They both occupied the same bedroom and bed. However, they did not indulge in sexual intercourse, and did not abandon the practice of not speaking to each other. Plaintiff left home on advice of counsel.

■ Appellant contends that on the evidence adduced the trial court was not justified in awarding plaintiff a divorce. To this we cannot agree. We have carefully considered the evidence and have reached the conclusion that the frequent and repeated acts of the defendant, complained of by plaintiff as constituting indignities, were clearly established and were such as to render plaintiff's condition intolerable. The proof further shows, in our judgment, that plaintiff is the innocent and injured party. But appellant contends that plaintiff has condoned such acts by living with the defendant for approximately a month after the filing of the petition. It is true that the parties lived in the same house and slept in the same bed during that time, but when all the evidence is examined it becomes apparent that there was no cohabitation in the true sense of the word. During that period these parties had no marital relations. They did not speak to each other, and would not eat at the same table.

■ Condonation in the law of divorce is the forgiveness of antecedent matrimonial offenses on condition that they shall

not be repeated, and that the one forgiven will treat the forgiving party with conjugal kindness: it is a remission of the matrimonial offense, and may be either express or implied. There was no express agreement of reconciliation in this case, nor can it be implied from the facts brought out in evidence. While it is true that, under the law, there is a strong presumption of condonation where the parties occupy the same room and bed, this presumption may be rebutted. Weber v. Weber, 195 Mo.App. 126, loc. cit. 129, 189 S.W. 577; Coan v. Coan, 264 Mass. 291, 162 N.E. 663; Morton v. Morton, 117 Cal. 443, 49 P. 557; Rushmore v. Rushmore, 174 A. 469, 12 N.J. Misc. 575; Brown v. Brown, 164 Ill.App. 589; Bracksmayer v. Bracksmayer, Sup., 22 N.Y.S.2d 110; Hann v. Hann, 58 N.J. Eq. 211, 42 A. 564. We believe the presumption was rebutted in this case.

The judgment is affirmed.

RUDDY, P. J., and WOLFE, J., concur.